**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 18 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

### UNITED STATES COURT OF APPEALS

### TENH CIRCUIT

---

DEBRA A. SHAW,

       Plaintiff-Appellee,

v.

AAA ENGINEERING & DRAFTING,
INC., a Utah corporation; WILBUR L.
BRAKHAGE, Supervisor; JANICE
KELLIN,

       Defendants-Appellants.


UNITED STATES OF AMERICA,

       Amicus Curiae.

No. 97-6265
& 97-6266

---

Appeal from the United States District Court
for the W. District of Oklahoma
(D.C. No. 95-CV-950-M)
(D.C. No. 95-CV-951-M)

---

John B. Hayes, of Hayes & Magrini, Oklahoma City, Oklahoma, for Defendants-
Appellants.

Marilyn D. Barringer, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

Matthew M. Collette, (Douglas N. Letter, with him on the brief), Appellate Staff,
Civil Division, Department of Justice, Washington, D.C., for Amicus Curiae.

Before **HENRY,** and **MURPHY,** Circuit Judges**,** and **KIMBALL,**[*]

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

One of these consolidated cases is a *qui tam* action brought under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33. Plaintiff Debra Shaw is the relator, suing her former employer on behalf of the United States Government for submitting false claims pursuant to a government contract. *See* 31 U.S.C. § 3729(a)(1)-(2). Specifically, Shaw claimed that Defendants had recorded falsely inflated numbers on official work orders and then used these work orders to support an equitable adjustment claim. Shaw also asserted that Defendants failed to recover silver from photo laboratory chemicals as required by the contract. In the other case, Shaw filed suit on her own behalf under the wrongful termination provision of the FCA, 31 U.S.C. § 3730(h). She also filed a pendant Oklahoma wrongful discharge claim. In these claims, Shaw asserted she was terminated in

[*]Honorable Dale A. Kimball, District Judge, United States District Court for the District of Utah, sitting by designation.

retaliation for reporting Defendants' fraudulent activities to U.S. government officials at TAFB.

Defendants AAA Engineering & Drafting, Inc. ("AAA"), Wilbur Brakhage, and Janice Keelin, now Keelin-Lowe, (collectively "Defendants") appeal from a judgment based on a jury verdict in Shaw's favor on all claims. Defendants raise the following issues on appeal: 1) whether the district court erred in denying Defendants' Rule 50 motions for judgment as a matter of law on Shaw's FCA *qui tam* claim that Defendants submitted false claims to the U.S. government; 2) whether the district court erroneously denied Defendants' Rule 50 motions on Shaw's FCA claim that she was terminated for her actions in furtherance of the FCA; 3) whether the district court erred in denying Defendants' Rule 50 motions on Shaw's Oklahoma public policy wrongful discharge claim; and 4) whether the district court erred in receiving certain evidence. This court exercises jurisdiction pursuant to 28 U.S.C. § 1291 and **affirms** the judgment based on the *qui tam* action and the FCA wrongful discharge action, but **reverses** that part of the judgment premised on the Oklahoma wrongful discharge claim.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Contract

In April 1993, Defendant AAA was awarded a government contract (the "contract") to perform photography services at Tinker Air Force Base ("TAFB") in Oklahoma.[1] AAA's duties under the contract included taking official Air Force studio photographs, taking passport photographs, providing a photo-journalist to photograph newsworthy events at TAFB, providing an on-call photographer to assist in TAFB law enforcement investigations, and developing photographs for TAFB personnel. Studio photography and most photography development was performed at TAFB's main photography laboratory (the "main lab"). Additionally, the contract required AAA to provide photography services at the metallurgical laboratory (the "met lab"), where AAA photographers assisted Air Force engineers by taking and developing detailed, technical photographs of failed aircraft parts.

When AAA began performance of the contract, it hired several employees of the preceding contractor, including Shaw. Shaw had been employed by photography service contractors at TAFB continuously since October 1980. During her employment with AAA, Shaw worked primarily as a photographer in the met lab.

B. Work Orders and the Request for an Equitable Adjustment

---

[1]Defendant Brakhage was AAA's project manger at TAFB until June 9, 1993. Defendant Keelin-Lowe was AAA's branch manager during the contracting period.

*1. Work Orders and the Government's Surveillance Under the Contract*

The contract required AAA to prepare work orders, form number 833, for all the work it performed under the contract. When a customer initially requested photography products or services, a work order would be generated. The customer would record on the work order the type and number of photographs or other products she was requesting and any materials, such as negatives, which she was providing. The work order would be assigned a number for tracking purposes (the "tracking number"), and the AAA employee responsible for the work order would record the work necessary to complete the customer's order. A priority level[2] would be assigned to the work and, if necessary, the work order would be routed through the government Quality Assurance Evaluator's ("QAE") office for pre-approval.[3]

An AAA employee would then perform the work and record matters such as the number of exposures taken, the amount of film developed, and how many pictures resulted. The finished products would then be packaged together with

---

[2]If a work order required faster processing than was normally required, it would be designated Priority One. For example, black and white photography development normally was required to be completed in three days, but if it was a Priority One work order, the required completion time was four hours.

[3]The QAE reviewed AAA's work on a day-to-day basis to ensure that AAA complied with the contract. The chief QAE under the AAA contract was Brenda Coil; the assistant QAE was Marianne Griffeth. Only some types of work, for example Priority One work, required QAE pre-approval.

the work order. The government QAE would then have the opportunity to review the work order and the final products, after which the QAE would return the work order and products to AAA. After the customer picked up the finished products, the AAA employee would record the type and amount of products actually delivered to the customer.

AAA would temporarily retain the work orders, grouping them numerically and by function. The numbers recorded on the work orders were tallied monthly and the results printed in monthly production reports which AAA was required to submit to the government under the contract. The work orders would then be returned to the QAE monthly where they then remained.

In addition to being the organizational mechanism for recording and tracking photography service orders, the work orders also assisted the government employees who monitored AAA's performance. QAE Brenda Coil testified, however, that pursuant to the contract she would only inspect a portion of AAA's finished production through a method called random surveillance. Random surveillance was performed in the following manner: at the end of each month, a computer program provided Coil with a randomly-generated list of the tracking numbers for the work orders she should inspect during the following month. If the tracking number was on her list, she would then compare the information recorded on the work order with the final product to determine whether the work

was performed timely and in compliance with the customer's request. She would also inspect the photographs, negatives, or other final products individually to determine whether the quality of the work was acceptable.[4]

### 2. The Equitable Adjustment

The contract originally required AAA to perform photography services for six months from April through September 1993, but it was later extended through December 1993. The contract called for a fixed monthly payment of $23,240. There were some circumstances, however, under which AAA's payment could be decreased or increased.

The way AAA could receive an increase in payment was by requesting an equitable adjustment. AAA could receive such an adjustment if it performed more work than was contemplated by the government at the time the contract was signed. Technical Exhibit Two to the contract specified the government's estimate of the amount of work AAA would be required to perform for specific tasks. If in the course of its performance AAA believed it was performing more work than indicated in the government's estimates, it could seek an equitable adjustment. Because the numbers recorded on the work orders should reflect the

---

[4]The random surveillance method was only utilized to review some types of work performed under the contract, such as studio photography and color printing services. Compliance with some contract requirements, for example the timeliness of an on-call photographer, was monitored simply through the presence or absence of customer complaints.

exact amount of work AAA had performed, in order to pursue an equitable adjustment AAA would need to calculate the total of the numbers recorded in the amount produced and amount delivered sections of those forms (the "production quantity sections"). If this total exceeded the government's previous production quantity estimates, AAA could use the work orders to support a claim for an equitable adjustment.

Indeed, on June 21, 1993, AAA complained in a letter to the government contracting officer ("CO") Steve Hammond that it had performed work in excess of that estimated by the government and thus requested an equitable adjustment. AAA first specifically linked this request to the work orders at a meeting with the government on June 30, 1993. At this meeting, AAA's president distributed a handout indicating that AAA's workload had exceeded the government's production estimates by an average of 31% per month during the first three months of the contract. AAA continued to claim that it was performing work in excess of the government's estimates throughout the contracting period. In January 1994, after the contracting period ended, AAA claimed that it had performed more work than the government's estimates in almost every category of work under the contract.

AAA originally claimed it was entitled to an equitable adjustment of $184,872 for the first six months of the contracting period. Because the requested

equitable adjustment was greater than $100,000, AAA was required to certify the claim. AAA's President did so in a letter to the government which stated:

> I certify that this claim for equitable adjustment in the amount of $184,872 is made in good faith, the supporting data is accurate and complete to the best of my knowledge, and that the amount to which I believe AAA is entitled accurately reflects the contract adjustment for which I believe the government is liable.

AAA later adjusted its claim to include expenses allegedly incurred for excess work performed during the last three months of the contract. The adjusted claim was for $248,410.15, and AAA issued a new certification based on this amount.[5]

In the hope of reaching an agreement on the equitable adjustment claim, the two sides agreed in early 1994 that AAA representatives and government representatives would together count the production quantities recorded on the work orders (the "joint count"), starting with work orders completed at the beginning of the contract. In spite of this agreement, however, the attempt to make the count a joint effort soon failed. After the first day, AAA employees and the government QAEs separated and conducted two distinct production quantity counts. QAE Marianne Griffeth counted on behalf of the government and Garbutt counted on behalf of AAA. The matters on which the two sides disagreed continued to be set aside for an ultimate determination by the CO.

---

[5] The new certification differed from the original only in the amount of the claim.

Despite the disagreements which arose at the joint count, the government QAEs did not then suspect that the production quantities recorded on the work orders might have been falsely inflated. QAE Griffeth was not instructed to examine the work orders to determine if there was evidence that AAA had falsely inflated its workload, and she did not report any problems of that kind. Additionally, Garbutt testified that the disagreements concerned only whether certain work should have been included on the work orders even if it was performed. Thus, at the time of the joint count, no one questioned whether the production quantities recorded on the work orders had been falsely inflated, either when they were originally completed or through subsequent alteration by AAA employees.

In addition to conducting its own count, the government requested assistance in evaluating AAA's equitable adjustment claim from the Defense Contract Audit Agency ("DCAA"). DCAA examined AAA's general financial records but did not examine the work orders. DCAA determined that AAA's equitable adjustment claim was computed by subtracting the total contract payments from its claimed total contract costs. As a consequence, DCAA concluded that AAA's calculation did not account for its own possible inefficiencies in performing the contract. AAA responded that there was no

inefficiency on its part and that the government's estimated workload figures were simply inaccurate.

After the production quantity counts, the DCAA audit, and further communication between AAA and the government COs, the government offered to settle AAA's equitable adjustment claim for $78,190. The government estimated that if AAA had hired one-and-a-half more employees at the beginning of the contract, it would have been able to timely complete the quantity of work reflected in the production quantity sections of the work orders. The government's settlement offer thus roughly equaled the salary of one-and-a-half additional employees for the duration of the contract. AAA eventually invoiced the government for and received the $78,190 as an equitable adjustment.[6] At the time of the settlement offer, the government COs and QAEs still did not suspect that information submitted by AAA on the work orders were falsified to make it appear as if AAA had completed more work than it had in fact performed. CO Hammond testified that if the government had known the work orders were falsely inflated, it would not have settled the equitable adjustment claim.

3. *The Work Orders Admitted at Trial*

---

[6]AAA then appealed to the Armed Services Board of Contract Appeals (ASBCA), arguing the settlement was insufficient. The ASBCA case was pending at the time of oral argument in the present appeal. *See generally Appeals of AAA Engineering & Drafting, Inc.*, 1999 WL 427880 (A.S.B.C.A.) (denying the government's motion to dismiss for reasons unrelated to the present appeal).

Prior to trial, it was discovered that some numbers recorded in the production quantity sections of the forms had been visibly altered, and that these and other numbers may have been falsely inflated. Nearly eighty of such work orders were admitted at trial. There were various problems with these work orders. On at least thirteen work orders, the number of prints ordered or the number of prints delivered were visibly altered. Additionally, some products were delivered to the customer without QAE review, which means the work order and resulting products were never sent to the QAE for her to determine if the work order tracking number was included on the QAE's random surveillance list. Other work orders displayed mathematical inconsistencies. For example, on one work order the customer requested six prints of three negatives, for a total of eighteen prints, but the work order showed that eighty-four prints had been delivered to the customer.

There was additional evidence which placed the production quantities recorded on the work orders in doubt. Shaw testified that three work orders which she had originally inspected had been visibly altered with inflated numbers. Former AAA photographer Larry Smith also identified three of his work orders which had been subsequently altered by someone else. Additionally, Sharon Bass, a former AAA employee, testified that at one point during the contract Brakhage directed AAA employees to "make the numbers higher," and that the employees

-12-

complied with that directive. According to Bass, Brakhage's stated reason for this directive was that he wanted to include test prints in the count, even though these test prints were not requested by or delivered to the customer. Both Smith and Bass testified that on another occasion, Brakhage directed employees to leave portions of the work order forms blank and said that he would complete the quantity produced and quantity delivered to the customer sections himself.

## C. Silver Recovery

Silver recovery is the process by which trace silver is removed from film processing solution, also known as fixer. During the photography development process, fixer is used to remove silver from film; the silver then leeches into the now-used fixer. The silver has to be removed before the used fixer can be safely disposed of in an ordinary drain. A silver recovery machine is used to separate the silver from the used fixer; this process is known as silver recovery. The recovered silver may then be sold and the used fixer disposed of in an ordinary drain. Under the contract, AAA was required to provide the equipment necessary for silver recovery and was required to dispose of the used fixer and other chemicals in accordance with Environmental Protection Agency ("EPA") guidelines and standards.[7]

---

[7]The contract's Performance Work Summary, § C-4, Para. 4.1.2, provides:
Precious Metal Recovery Equipment. The contractor is
required to provide any precious metal recovery

(continued...)

Shaw testified that in mid-April, 1993, she asked her supervisor, Brakhage, for containers to store used fixer until silver recovery could be accomplished and that Brakhage responded, "[W]e're not going to mess with that, just dump it." Shaw further testified that when she continued questioning Brakhage, he replied "just dump it down the drain, we're not going to mess with it." Shaw discussed Brakhage's directive with her assistant photographer in the met lab, Sharon Massegee-Thrower. Massegee-Thrower felt they were at risk to be terminated and should do as instructed. Shaw was uncertain, and she left the met lab to find containers for the used fixer. When she returned, Massegee-Thrower was pouring the used fixer down the drain. Shaw stopped her, and they argued. Shaw then called and informed QAE Coil that Brakhage directed her to pour the used fixer down the drain. Coil later reported this to CO Hammond.

There was also testimony of at least two additional instances when Brakhage directed employees to dispose of used fixer in the drain, three instances when employees were observed using the drain for used fixer disposal, and two

[7](...continued)
equipment deemed necessary for proper disposal and/or recovery of precious metals/chemicals. All recovery disposal shall be accomplished by the contractor with all recovered materials remaining the property of the contractor. Contractor shall dispose of chemicals in accordance with EPA guidelines and standards.

Section C-5, Para. 5.9 also states: "The contractor shall establish a Precious Metals Recovery Program, to comply with Environmental Protection Agency requirements."

instances when fixer residue was observed in lab sinks. Throughout this time, the government questioned AAA about silver recovery. After CO Hammond learned there was a problem, he mentioned the lack of silver recovery equipment in the photography labs at a meeting with AAA's managers. CO Hammond testified that Keelin-Lowe responded, "[B]e patient, we're trying our best to get everything worked out and . . . we plan on having it." When Hammond mentioned the lack of silver recovery equipment to Keelin-Lowe again in May or June 1993, he testified her response was the same. Additionally, on more than one occasion QAE Coil asked Brakhage what AAA was doing to accomplish silver recovery. Coil testified that Brakhage initially responded to her inquiry by saying "We're working on it." Later, however, he responded, "[Y]ou don't want to know." Eventually, Brakhage would not respond to Coil's inquires at all.

Prompted by allegations that chemicals had been improperly poured down the drain, the Office of Special Investigation inspected and temporarily closed the main lab in July 1993. AAA first installed a silver recovery unit in the main photo lab after this inspection. Massagee-Thrower testified that shortly after the inspection, Mike McCurry, AAA's project manager at the time, told her that AAA was in trouble because of its failure to practice silver recovery. Massegee-Thrower further testified that McCurry instructed her to deny improper disposal of used fixer if questioned by government employees. According to the

-15-

testimony, when Massegee-Thrower responded that this would be a lie, McCurry replied, "I know it is, but I just talked to [Keelin-Lowe] and we were told to say that . . . . I lied and you better, too, if you know what's good for you."

**D. Retaliation**

QAE Coil testified that on May 14, 1993, Brakhage told her he felt like Keelin-Lowe "really had it in for [Shaw] and [Massegee-Thrower] and that anything to do with silver recovery. . . she would probably pin on them in an effort to get rid of them." Coil further testified that on June 2, 1993, Brakhage told her "people like Debra Shaw who complain too much . . . could not be tolerated by [Keelin-Lowe]." Brakhage elaborated that Shaw was "always bitching about silver recovery and paper chemicals, etc." Coil then testified, "I told Mr. Brakhage that Debra Shaw told me that when she asked what to do about the [used fixer], she was told to put it down the drain. He didn't say anything. *He just walked away from me angry, mad at me*." (emphasis added)

Shaw was terminated by AAA on June 23, 1993. According to the testimony of two AAA employees, immediately after firing Shaw, Keelin-Lowe's assistant Beth Snyder-Hurley told them she had "fired that troublemaker." Shaw remained unemployed for approximately six months before being hired by AAA's successor at TAFB. Shaw also lost some employment benefits as a result of the interruption of her years of service at TAFB.

-16-

## E. Procedural History

At the close of Shaw's evidence and again at the close of all the evidence, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).[8] Defendants argued 1) there was insufficient evidence to support Shaw's *qui tam* claims based on the work orders; 2) the failure to recover silver in violation of the contract could not, as a matter of law, be the basis for an FCA action; 3) Shaw had not satisfied the elements of a retaliation claim under the FCA; and 4) Shaw failed to demonstrate that her termination violated any Oklahoma public policy.

These motions were denied and the case went to the jury, which found each defendant liable for three false claims under the FCA and found total actual damages of $4900. The jury also found that defendant AAA discharged Shaw because of her lawful acts in furtherance of an FCA lawsuit and in violation of Oklahoma public policy. The jury awarded Shaw $100,000 in compensatory

---

[8]At the close of Shaw's case-in-chief, Defendants moved for a dismissal of Shaw's claims based on insufficient evidence, and this motion was incorporated by reference at the close of all the evidence. In addition, Defendants requested an instruction to the jury to return a "directed verdict" for the Defendants. This court construes Defendants' motions as motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). *Cf. FDIC v. UMIC, Inc.,* 136 F.3d 1375, 1382 n.1 (10th Cir. 1998), *cert. denied*, 535 U.S. 962 (U.S. Nov. 2, 1998 (No. 98-186).

damages under the FCA and state law wrongful discharge claims,[9] and $25,000 in punitive damages based solely on the state law claim.

Judgment was entered jointly and severally against the Defendants for three times the actual damages found by the jury in the *qui tam* action, or $14,700, plus $15,000 in civil penalties.[10]  The district court awarded Shaw as the *qui tam* plaintiff $7425, or 25% of the government's FCA award.  *See* 31 U.S.C. § 3730(d)(2).  Judgment was also entered on the wrongful discharge action against AAA alone for $100,000 compensatory and $25,000 punitive damages.  Finally, the district court ordered Shaw's original seniority status reinstated at TAFB.  *See* *id*. § 3730(h).

## III.  DISCUSSION

### A.  False Claims

Defendants appeal the denial of their Rule 50(a) motions on Shaw's FCA *qui tam* claim.  Rule 50(a) provides,

---

[9]The jury was instructed that the state and federal wrongful discharge claims were alternative theories of recovery and that Shaw was entitled to recover compensatory damages only once.

[10] Persons who violate the False Claims Act (FCA) are "liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . ."  31 U.S.C. 3729(a).  The district court imposed a civil penalty of $5000 for each of the three false claims, resulting in $15,000 in total penalties.

-18-

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgement as a matter of law against that party. . . .

This court reviews *de novo* the denial of a motion for judgment as a matter of law, applying the same legal standard as the district court and construing the evidence and inferences therefrom in the light most favorable to the nonmoving party. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996). We may not weigh evidence, pass on the credibility of witnesses, or substitute our judgment for that of the jury. *See id.* Judgment as a matter of law is improper unless the evidence so overwhelmingly favors the moving party as to permit no other rational conclusion. *See id.*

> The applicable sections of the FCA state:

> (a) Liability for certain acts. -- Any person who --
>     (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or]
>     (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . .
> is liable. . . .

31 U.S.C. § 3729(a)(1)-(2). Although the verdict form instructed the jury to indicate the number of false claims for which Defendants were liable, the form did not instruct the jury to specify *which* of Defendants' actions were FCA violations. In Defendants' opening brief, they contend that Shaw alleged two

-19-

types of FCA violations at trial: 1) the work orders were "false or fraudulent record[s] or statement[s]" designed to cause a false or fraudulent claim to be paid or approved by the United States pursuant to 31 U.S.C. § 3729(a)(2); and 2) the monthly invoices, submitted after failure to practice silver recovery as required by the contract, were false claims pursuant to *id*. § 3729(a)(1). Defendants argue that the district court should have granted their Rule 50(a) motions on the FCA *qui tam* claim because neither the work orders nor the invoices, given the evidence presented, constitute false or fraudulent claims.

Because Defendants never made a Rule 50(b) motion and now appeal only from the denial of their Rule 50(a) motions, the question before this court is whether the district court properly allowed the jury to render a verdict on Shaw's FCA claim. Thus, if a reasonable jury could have found, based on the evidence presented at trial, that *any* of AAA's activities violated the FCA, the district court was correct in denying AAA's Rule 50(a) motions on Shaw's FCA claim. This court therefore may affirm the judgment on Shaw's FCA claim if *either* the work orders or the monthly invoices could constitute "false or fraudulent claims" based on the evidence presented.

*1. The Work Orders*

Defendants first contend that only claims submitted for the purpose of receiving payment are actionable under the FCA, and because AAA's submission

of work orders did not serve that purpose, they cannot form the basis for Shaw's FCA claim. They assert the work orders were submitted merely as a record of work requested and work performed. Moreover, Defendants argue that the work orders did not contribute towards AAA's receipt of the equitable adjustment; rather, the equitable adjustment settlement was based solely on the government's decision that with one-and-a-half additional employees plus additional supplies, AAA could have timely performed the work which it claimed exceeded the government's estimates in the contract. The Defendants thus contend that even if some of the work orders were false and fraudulent records, because they were not linked to any payment from the government, they could not be the basis for FCA liability.

This argument fails, however, because the purported provision of work exceeding the government's estimates, which AAA proved by reference to work orders, prompted the award of an equitable adjustment for some amount. COs Hammond and Nicewander both testified they relied on the work orders in deciding to grant an equitable adjustment. CO Dan Gaston also testified that if the production quantity numbers on the work orders were falsely inflated, this would have a "direct impact" on an equitable adjustment request which was based on workload. Simply because the production quantities recorded on the work orders did not determine the *exact* amount of the settlement does not

eradicate a connection between the work orders and the equitable adjustment. This court thus concludes that the work orders were submitted, at least in part, to justify AAA's request for the equitable adjustment payment.

Defendants' second argument is that the work orders do not constitute false or fraudulent records because the numbers on the orders with which the government disagreed during the joint count merely reflected AAA's different interpretation of the contract. Defendants point out that this dispute arose because AAA wanted to include certain items on the work orders which the QAEs thought should not be counted under the terms of the contract. This argument, however, entirely ignores the substantial evidence, which we must view in a light most favorable to Shaw, indicating that the numbers AAA recorded on the work orders represented work that was never actually performed, not merely work which might not justify compensation pursuant to the contract. This evidence gave rise to an inference that the work orders were deliberately or recklessly[11]

---

[11] The intent requirement under the FCA is defined as follows:
> "Knowingly" means that a person, with respect to information --
> > (1) has actual knowledge of the information;
> > (2) acts in deliberate ignorance of the truth or falsity of the information; or
> > (3) acts in reckless disregard of the truth or falsity of the information,
> and no proof of specific intent to defraud is required.

31 U.S.C. § 3729 (b).

altered for the purpose of causing the government to pay additional sums in the form of an equitable adjustment. *See id*. § 3729(a)(2), (b). There was thus sufficient evidence to support a finding by the jury that some of the work orders were false records submitted in order to get a false claim paid. *See id*. § 3729(a)(2).

## 2. *The Monthly Invoices*

Defendants argue that an invoice, submitted after the violation of a contractual provision,[12] cannot constitute the knowing presentation of "a false or fraudulent claim for payment or approval" under the FCA.[13] *Id*. § 3729(a)(1). Specifically, Defendants assert that the monthly invoices which they submitted could not be false or fraudulent because the invoices only billed the amount called for by the fixed price contract and did not contain any factual misrepresentations regarding either monthly billings or AAA's equitable adjustment request. The

---

[12]Defendants conceded in their Rule 50 motion that disposing used fixer without first practicing silver recovery would violate the contract.

[13] Defendants characterize Shaw's argument as saying that *each* monthly billing subsequent to the *first* improper disposal of used fixer constituted a "false or fraudulent claim." This court, however, understands her argument to be slightly different: The invoices for each month in which AAA failed to practice silver recovery yet billed the government for the full amount under the contract constituted false claims. Also, because no silver recovery machine existed in AAA's labs at TAFB until July 1993, it can be fairly inferred that the used fixer continued to be improperly disposed from April until July, or for three to four invoices.

United States, appearing as *Amicus Curiae*,[14] responds that when AAA submitted its monthly invoices, it impliedly certified that it had complied with the silver recovery provisions in the contract; because AAA was being paid not only for photography services but also for environmental compliance, its false implied certification of compliance with the contract's silver recovery requirement gives rise to liability under the FCA.

Permitting FCA liability based on a false certification of compliance with a government contract, whether the certification is express or implied,[15] is consistent with the legislative history of the 1986 Amendments to the FCA. *See* S. Rep. No. 99-345 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266. The Senate Committee on the Judiciary noted a false claim under the FCA "may take many forms, the most common being a claim for goods or services not provided, *or provided in violation of contract terms, specification, statute, or regulation.*"

---

[14]We grant Defendants' application for leave to respond to the *Amicus Curiae* brief filed by the United States government.

[15]In numerous cases, *express* false certification of compliance with a government contract provision has been the basis for an FCA claim. *See, e.g.*, *United States v. Rule Indus., Inc.*, 878 F.2d 535, 536-37 (1st Cir. 1989); *United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302-04 (6th Cir. 1998); *United States ex rel. Fallon v. Accudyne Corp.* 880 F. Supp. 636, 638 (W.D. Wis. 1995) (*Fallon I*). In the instant case, however, this court must only decide whether an FCA claim may be premised on *implied* false certification of contractual compliance.

S.Rep. No. 99-345 at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274 (emphasis added).

Additionally, the language and structure of the FCA itself supports the conclusion that, under 31 U.S.C. § 3729(a)(1), a false implied certification may constitute a "false or fraudulent claim." This interpretive conclusion flows from a distinction between the language of § 3729(a)(1) and that of § 3729(a)(2). Under § 3729(a)(2), liability is premised on the presentation of a "false record or statement to get a false or fraudulent claim paid or approved." Section 3729(a)(1), however, requires only the presentation of a "false or fraudulent claim for payment or approval" without the additional element of a "false record or statement." *See United States ex rel. Fallon v. Accudyne*, 921 F. Supp. 611, 627 (W.D. Wis. 1995) (*Fallon II*) (noting this distinction between § 3729(a)(1) and § 3729(a)(2)); *cf. United States ex rel. Aakhus v. Dyncorp, Inc.* 136 F.3d 676, 682-83 (10th Cir. 1998) (concluding that there needs to be a specific statement by a contractor in order to support a cause of action under § 3729(a)(2)). Thus, FCA liability under § 3729(a)(1) may arise even absent an affirmative or express false statement by the government contractor.

The validity of an FCA claim based on a false implied certification of contractual compliance has been expressly recognized by the Court of Federal Claims and at least one district court. In *Ab-Tech Constr., Inc. v. United States*,

-25-

Ab-Tech was a minority-owned small business which was awarded a service contract by the Small Business Administration. *See* 31 Fed. Cl. 429, 430 (1994), *aff'd without written opinion* 57 F.3d 1084 (Fed. Cir. 1995). Ab-Tech then entered into a prohibited co-management agreement with one of its principal subcontractors, a non-minority owned enterprise, but nevertheless continued to submit claims for payment to the government and to receive payment under the contract. *See id.* at 431-33. Stating that the FCA "extends 'to all fraudulent attempts to cause the Government to pay out sums of money,'" the *Ab-Tech* court concluded the claims for payment were false claims within the meaning of the FCA. *Id.* at 433 (quoting *United States v. Neifert-White*, 390 U.S. 228, 233 (1968)). The *Ab-Tech* court reasoned the "payment vouchers represented *an implied certification* by Ab-Tech of its continuing adherence to the requirements for participation in the [minority-owned business] program." *Id.* at 434 (emphasis added); *see also United States ex rel. Pogue v. American Healthcorp, Inc.*, 914 F. Supp. 1507, 1508-10, 1513 (M.D. Tenn. 1996) (vacating a prior dismissal decision in an FCA suit based on the theory that by submitting Medicare claims defendants implicitly certified compliance with the statutes, rules, and regulations governing the Medicare program); *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 124-25 (1997) (holding that invoices provided by a government contractor for the supply of goods impliedly but falsely represented

contractual compliance which was "critical to defendant's decision to pay," and thus invoices constituted false claims under the FCA). The *Ab-Tech* court also reasoned that each submission seeking payment from the government constituted a "claim" under the FCA, even when the submissions were made pursuant to one contract. *See* 31 Fed. Cl. at 435.

Without explicitly stating that the decisions were based on an implied certification theory, other cases have also recognized that FCA liability may arise even when there has been no express false declaration. The D.C. Circuit, for example, determined that a contractor may be liable under the FCA when it knowingly omitted from progress reports material information concerning non-compliance with the program it had contracted to implement. *See United States v. TDC Management Corp.*, 24 F.3d 292, 296, 298 (D.C. Cir. 1994); *see also United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464-65 (9th Cir. 1999), *petition for cert. filed*, 68 U.S.L.W. 3491 (U.S. Jan. 20, 2000) (No. 99-1225) (concluding that a contractor's failure to disclose information specifically requested by the government can form the basis for FCA liability); *Fallon II*, 921 F. Supp. at 621 (holding that a contractor may be liable under the FCA for knowingly failing to perform a material requirement of the contract yet seeking full payment without disclosing its nonperformance).

Not all courts have embraced the theory that an FCA suit may be based on an implied certification. Those cases, however, are distinguishable. For instance, while not expressly addressing an implied certification claim, the Ninth Circuit concluded that a teacher who accused her school district of failing to comply with federal and state laws could not maintain an action under the FCA. *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261 (9th Cir. 1996). The *Hopper* court reasoned that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA," and held there must be a "false certification of compliance" with those laws. *Id.* at 1266-67. The forms on which the *Hopper* plaintiff premised her FCA claims, however, differed significantly from AAA's monthly invoices. The *Hopper* forms did not request payment for statutory or contractual compliance and thus did not impliedly certify such compliance. Additionally, the court in *Hopper* reasoned the relator had not produced sufficient evidence that the defendant "knowingly" maintained a policy not to be in compliance with federal laws. *See id*. at 1268. In contrast, Shaw presented ample evidence that AAA knowingly failed to practice silver recovery but nevertheless invoiced for and accepted full payment under the contract.

One district court has also held that a contractor's violation of state law may not support an FCA action without some express certification that Defendant complied with those laws. *See United States ex rel. Joslin v. Community Home*

-28-

*Health of Md., Inc.,* 984 F. Supp. 374, 383-84 (D. Md. 1997).  The *Joslin* court expressed concern with the decision in *Ab-Tech*, because it feared the doctrine of implied certification would permit "FCA liability potentially to attach every time a document or request for payment is submitted to the Government, regardless of whether the submitting party is aware of its non-compliance."  *Id*. at 384.  While the *Joslin* court surmises the *Ab-Tech* court ignored the FCA's "knowing" requirement, this court reads the *Ab-Tech* decision differently.  *See id*. at 384-85.  Regardless of *Ab-Tech*, however, this court holds that when FCA liability is premised on an implied certification of compliance with a contract, the FCA nonetheless requires that the contractor knew, or recklessly disregarded a risk, that its implied certification of compliance was false.  *See* 31 U.S.C.A. § 3729(b); *see also infra*   Section III.B.2.

In sum, because Shaw presented sufficient evidence demonstrating AAA submitted invoices for full payment on the contract knowing it had failed to comply with the silver recovery contract requirements, the district court properly denied AAA's Rule 50(a) motions.

**B.  Other Qui Tam Issues**

   *1.  Materiality*

Defendants also argue on appeal that the FCA contains a materiality requirement which was not met here.[16]   We decline to address this argument, however, for Defendants failed to present it to the district court.  In neither of their Rule 50 motions did the Defendants mention "materiality," or any similar concept such as "causation" or "governmental reliance," as elements which Shaw must, but failed, to satisfy.  Defendants simply argued, as discussed above, that a mere violation of the contract cannot legally constitute a false claim.  Defendants did not argue to the district court that the failure to practice silver recovery was not material, or that it did not cause the government to pay more than it would have in the absence of AAA's contract violations.  This court therefore concludes Defendants have waived this argument for appellate review.  We decline to decide whether the contractual provision with which a defendant failed to comply must be material or the non-compliance itself must be a material breach in order to prevail on an implied certification theory under the FCA.[17]  *See King of the*

---

[16]Defendants make this argument only with respect to the evidence of their failure to practice silver recovery.

[17]In their opening brief, Defendants allege there was no evidence of monetary damages to the government flowing from their failure to practice silver recovery.  In their brief in reply to the United States as *Amicus Curiae*, Defendants develop this into a separate argument: they argue that based on the silver recovery theory of liability, the jury had no evidence from which to assess $4,900 in actual damages.  This issue was not separately raised in the Defendants' opening brief, however, and thus the point is waived.  *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

*Mountain Sports, Inc. v. Chrysler Corp.,* 185 F.3d 1084, 1091 n.2 (10th Cir. 1999).

### 2. Intent and Government Knowledge

Defendants also argue that neither the failure to practice silver recovery nor the work orders can be the basis for false claims under the FCA because the QAE and the Contracting Officers 1) had access to the work orders during the contract and 2) knew about the failure to practice proper silver recovery. Defendants reason that because of this government knowledge, AAA could not have had the requisite intent to violate the FCA. *See* 31 U.S.C. § 3729 (b).

Prior to amendments in 1986, the FCA contained the following language: "The court shall have no jurisdiction to proceed with any [FCA] suit . . . whenever it shall be made to appear that such suit was based upon evidence or information in the possession of the United States, or any agency, officer, or employee thereof, at the time such suit was brought." 31 U.S.C. § 232(C) (1976). This language was removed in 1986, however, and government knowledge of a contractor's wrongdoing is no longer an automatic defense to an FCA action. *See United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1420 (9th Cir. 1991); 31 U.S.C. §§ 3729-3733. Nevertheless, there may still be occasions when the government's knowledge of or cooperation with a contractor's actions is so extensive that the contractor could not as a matter

of law possess the requisite state of mind to be liable under the FCA. *See United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995); *Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992).

In *Butler*, for example, the Ninth Circuit affirmed a directed verdict for the government contractor. *See Butler*, 71 F.3d at 323. Butler argued the Defendant falsified test reports because a different type of tests were performed than those identified in the reports. *See id*. at 328. The evidence showed, however, that the tests were the subject of discussion between the defendant and the Army, and the Army knew of and had approved the testing method actually used. *See id*. The *Butler* court stated, "[T]he only reasonable conclusion a jury could draw from the evidence was that [defendant] and the Army had *so completely cooperated and shared all information . . . that [defendant] did not 'knowingly' submit false claims . . . .*" *Butler*, 71 F.3d at 327 (emphasis added). Similar facts underlie *Wang*, in which the government had extensive knowledge of all the engineering deficiencies identified by the *qui tam* relator, and the defendant had an ongoing dialogue with the government about the problems. *See Wang*, 975 F.2d at 1421.

Assuming some level of government knowledge would negate the intent requirement under the FCA as a matter of law, the level of government knowledge in the present case does not do so. It was the plaintiff, Shaw, and not the

-32-

individual defendants or other AAA employees, who told the government about the failure to practice silver recovery. Additionally, AAA was not forthcoming about silver recovery and repeatedly evaded government employees' questions on the subject.[18]

As for the work order evidence, this court has already determined that the evidence supports an inference that Defendants falsely inflated the production quantities on some work orders. Moreover, several government employees testified that during the performance of the contract and the settlement of the equitable adjustment claim, including the joint count, they were unaware that any work orders may have been falsely inflated. The government's alleged knowledge of Defendants' actions therefore does not, as a matter of law, negate the evidence of Defendants' intent to submit a false record in support of a claim. *See* 31 U.S.C. § 3729(a)(2).

## C. Retaliation Claim

The Defendants also appeal the district court's denial of their motions for judgement as a matter of law on Shaw's retaliation claims. The standard of

---

[18]Defendants also argue AAA's management did not know of the failure to practice silver recovery, and therefore they cannot be held liable for false claims which resulted from this failure. The evidence, however, showed the following: 1) Brakhage, the project manager, directed several employees to dispose of used fixer without practicing silver recovery; and 2) McCurry, also the project manager, both disposed of used fixer himself without practicing silver recovery and told Massegee-Thrower to lie about it.

review is *de novo*, and this court construes the evidence and inferences therefrom in the light most favorable to the nonmoving party. *See Greene*, 98 F.3d at 557.

Shaw alleged AAA discharged her because of her acts in furtherance of a *qui tam* action.[19] Defendants argue AAA was not aware of Shaw's protected lawful activities and thus could not have terminated her for engaging in those activities.[20] This argument ignores testimony by QAE Coil. Coil testified that on June 2, 1993, she told Brakhage that Shaw informed her that Brakhage told Shaw to pour used fixer down the drain. Coil then connected Brakhage with the termination when she further testified that Brakhage said Keelin-Lowe intended to fire Shaw because Shaw had complained about AAA's failure to practice silver recovery. A reasonable jury could therefore infer that Brakhage told Keelin-Lowe about Shaw's reporting to the government, and Keelin-Lowe fired Shaw because

---

[19] "Any employee who is discharged . . . by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole." 31 U.S.C. § 3730(h).

[20] Defendants also argue that they submitted no false claims and thus Shaw could not have taken any action in furtherance of a false claims suit. Because this court has determined Shaw presented sufficient evidence that AAA submitted false claims under the FCA, however, we need not consider this argument. *See supra* Section III.A.

For the same reason, we reject Defendants' argument that the district court abused its discretion in giving instruction eighteen.

-34-

of the reporting. This court thus affirms the denial of Defendants' Rule 50(a) motions on Shaw's FCA retaliation claim.

## D. Oklahoma Public Policy Claim

Shaw also alleged that she was terminated in violation of the public policy exception to the Oklahoma employment-at-will doctrine. Defendants moved for judgment as a matter of law on this state law claim, arguing that Oklahoma lacks a well-defined public policy in favor of employees who report the submission of false claims by their employers. The district court denied these Rule 50(a) motions and the jury subsequently rendered a verdict in favor of Shaw on her state law claim. Defendants now appeal the denial of those motions on that claim, and this court reviews those rulings *de novo*. *See id.*

In *Burk v. K-Mart Corp.*, the Oklahoma Supreme Court stated that the public policy exception only applies "in a narrow class of cases in which the discharge is contrary to a clear mandate of public policy as articulated by constitutional, statutory or decisional law." 770 P.2d 24, 28 (Okla. 1989). Additionally, on appeal from the grant of summary judgment in federal district court in *Burk*,[21] the Tenth Circuit determined there was no Oklahoma public

---

[21]The Oklahoma Supreme Court's opinion in *Burk* was issued following the certification of questions from the United States District Court for the Northern District of Oklahoma. *See Burk v. K-Mart Corp.*, 770 P.2d 24, 25-26 (Okla. 1989).

policy against terminating employees in retaliation for general whistle blowing. *See Burk v. K Mart Corp.*, 956 F.2d 213, 214 (10th Cir. 1992).

The Tenth Circuit has also determined that whistle blowing under the Fair Labor Standards Act and the Family and Medical Leave Act does not fall under the Oklahoma public policy exception. *See Richmond v. ONEOK, Inc.*, 120 F.3d 205, 210 (10th Cir. 1997); 29 U.S.C. §§ 201-219; 29 U.S.C. §§ 2601-2654. In *Richmond*, this court stated that public policy exception "claims must have their basis in Oklahoma state law." 120 F.3d at 210; s*ee also McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1487-88 (10th Cir. 1996).

The Oklahoma Court of Civil Appeals has held, however, that an employee who alleged he was terminated for reporting violations of the federal Food, Drug, and Cosmetic Act to his superiors stated a claim for wrongful discharge within the *Burk* public policy exception. *See Tyler v. Original Chili Bowl, Inc.*, 934 P.2d 1106, 1108-09 (Okla. Ct. App. 1997). In *Griffin v. Mullinix*, decided seven months after *Tyler*, the Oklahoma Supreme Court stated that the federal Occupational Safety and Health Act did not, standing alone, constitute a statement of a well-defined Oklahoma public policy as demanded by *Burk*. *See Griffin v. Mullinix*, 947 P.2d 177, 180 (Okla. 1997). The *Griffin* court cited with approval this court's decision in *McKenzie*, stating, "The Oklahoma Legislature, not this

-36-

Court or Congress, is primarily vested with the responsibility to declare the public policy of this state." *Id.*

Although perhaps falling short of a categorical statement that federal law can *never* be the basis for a claim under the public policy exception, the *Griffin* court's statement is sufficient authority that the FCA is not a statement of a well-defined Oklahoma public policy.[22] The FCA thus cannot be the basis, standing alone, for a claim under the *Burk* public policy exception to the employment-at-will doctrine. Because Shaw failed to point out any Oklahoma decision, statute or constitutional provision supporting employees who report FCA violations, this court reverses the denial of Defendants' Rule 50(a) motions on Shaw's state wrongful discharge claim.[23] Additionally, because the FCA does not provide for

---

[22]Admittedly, this conclusion appears to conflict with *Tyler v. Original Chili Bowl, Inc.*, 934 P.2d 1106, 1108-09 (Okla. Ct. App. 1997). This court rejects *Tyler* as binding state authority, however, because we are "convinced by persuasive indications," namely the later decision in *Griffin v. Mullinix*, 947 P.2d 177, 180 (Okla. 1997), that the Oklahoma Supreme Court would not follow the *Tyler* holding. *Best v. State Farm Mut. Auto. Ins. Co.*, 953 F.2d 1477, 1481 (10th Cir. 1991); *see also* Okla. Stat. Ann. tit. 20, § 30.5 ("No opinion of the Court of Civil Appeals shall be binding or cited as precedent unless it shall have been approved by the majority of the justices of the Supreme Court for publication in the official reporter."); Okla. Stat. Ann. tit. 12, Appendix 1, Rule 1.200(c)(2) (establishing that opinions of the Court of Civil Appeals ordered released for publication by that court but not by the Oklahoma Supreme Court have persuasive effect but are not accorded precedential value).

[23]Defendants also argue that the district court erred in giving jury instruction twenty, which provided that Shaw's reporting of AAA's actions was consistent with Oklahoma's public policy of complying with federal

(continued...)

-37-

punitive damages, and because the jury was instructed to award punitive damages only for a violation of Oklahoma public policy, the award of punitive damages is vacated.[24]  *See* 31 U.S.C. § 3730(h).

## E.  Evidence Issues

Defendants contend that the district court erred in admitting certain evidence.  This court reviews the district court's decision to admit evidence for an

_____

[23](...continued)
environmental regulations.  In light of our decision that Defendant's Rule 50 motions concerning the pendant state public policy claim should have been granted, this court agrees with Defendants that instruction twenty was given in error.  Defendants then state, without citation to the record or further argument, that the instruction misled the jury and that the entire judgment should be vacated and a new trial ordered.  Because Defendants provide this court with no basis on which to conclude that this instruction misled the jury as to the federal law issues, this argument is waived.  *See Franklin Savings Corp. v. United States,*    180 F.3d 1124, 1128 n.6 (10th Cir. 1999),    *cert denied* , 120 S.Ct. 398 (U.S. Nov. 1, 1999) (No. 99-208).

[24]The jury was instructed that the state and federal claims were merely alternative theories of recovery and that Shaw was only entitled to recover compensatory damages once. The verdict form further instructed the jury to award compensatory damages if it found Shaw's termination violated       *either*  the FCA or Oklahoma public policy.  The award of $100,000 in compensatory damages therefore stands.

-38-

abuse of discretion.[25]  *See Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1086 (10th Cir. 1994).

First, Defendants maintain the district court erred in allowing Contract Discrepancy Reports ("CDRs") to be admitted.  They argue on appeal that the reports were meant to prejudice the jury and show that less than perfect performance gives rise to an FCA suit.  This argument appears to be premised on Federal Rule of Evidence 403, although no reference is made to Rule 403.  At trial, Defendants simply stated that these reports were irrelevant, without arguing unfair prejudice.  Absent plain error, a claim of "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless . . . [when] the ruling is one admitting evidence, a timely objection . . . appears of record, *stating the specific ground of the objection . . . .*"  Fed. R. Evid. 103(a)(1).  The admission of the CDRs was not plain error, and Defendants thus waived for appellate review any argument beyond relevance.  *See Wheeler v. John Deere Co.*, 862 F.2d 1404, 1409 n.1 (10th Cir. 1988).  Considering only the relevance objection, these CDRs

---

[25]Defendants allege fifteen specific errors in the admission of evidence in their opening brief, but they only present specific arguments as to five instances. In addition, Defendants broadly state, without citation to the record or authority and with only superficial development of the argument, that a great deal more evidence was improperly admitted.  This court concludes, both as to the ten instances which were specified but not discussed and as to the general allegation of additional improper admission of evidence, that Defendants developed these arguments so superficially as to waive them for appellate review. *See Franklin Savings Corp.,* 180 F.3d at 1128 n.6.

demonstrated that contract payments could in certain instances be reduced for deficient performance. This negated AAA's argument that it could only be paid a fixed price under the contract. In addition, the evidence was relevant to a general understanding of the way the parties functioned under the contract and to demonstrate that during the contracting period Defendants had a motivation to conceal violations of the contract. Thus, the district court did not abuse its discretion in determining the CDRs were relevant and allowing their admission.

Second, Defendants argue that three lists of customer complaints against AAA were erroneously admitted over a relevance objection, asserting on appeal that this evidence was also intended to prejudice the jury. Once again, however, Defendants waived all but their relevance challenge. *See id*; Fed. R. Evid. 103(a)(1). As for the relevance objection, there was no abuse of discretion in admitting this evidence. In context, it was clear these customer complaints related to the CDRs. They were thus relevant to a general understanding of the contract and the method by which contract payments could be reduced.

Third, over Defendants' objection, CO Nicewander testified that some organizations on TAFB were dissatisfied with AAA's performance. On appeal, Defendants argue that this evidence was offered solely to prejudice the jury. The objection at trial, however, was that the question prompting Nicewander's testimony was outside the scope of cross-examination. Defendants' challenge on

appeal to this testimony is thus waived. *See Wheeler*, 862 at 1409 n.1; Fed. R. Evid. 103(a)(1).

Fourth, Defendants objected to the work orders based on relevance and a failure to timely list them as trial exhibits. We first dispose of Defendant's relevance argument by noting that one of Shaw's *qui tam* theories was based on Defendants' submission of these and other work orders in support of an equitable adjustment claim, pursuant to 31 U.S.C. § 3729(a)(2). The work orders themselves would thus be relevant to Shaw's claim that the work orders were false records submitted in order to obtain payment.

Defendants contend that they were prejudiced because they did not have time to conduct meaningful discovery or to locate rebuttal witnesses. All the work orders admitted were listed in the pretrial order, however, and Shaw sent copies to AAA in March 1997. It was thus not an abuse of discretion for the district court to rule that Defendants were not unfairly prejudiced by the introduction of these work orders.

Finally, over a relevance objection, the district court admitted a letter from an Air Force officer to the CO dated one day prior to Shaw's termination. The letter praised Shaw's and Massegee-Thrower's performance in the met lab, and was thus relevant to counter AAA's assertions that Shaw was fired for poor performance. It was not an abuse of discretion to admit this evidence.

-41-

## VI. CONCLUSION

For the reasons set out above, this court **AFFIRMS** the judgment against Defendants on Shaw's FCA *qui tam* and retaliation claims. However, we **REVERSE** the judgment against Defendants on the Oklahoma public policy claim and order that the award of punitive damages be vacated.