**UNITED STATES of America, ex. rel., Tommy HOLEMAN, Plaintiff,**

v.

**CITY OF COMMERCE CITY, COLORADO; Urban Renewal Authority of Commerce City, Defendants.**

**No. CIV. A. 98–B–755.**

United States District Court, D. Colorado.

Aug. 16, 2000.

Seth J. Benezra, Gilbert M. Roman, Roman, Benezra & Culver, L.L.C., Lakewood, CO, for Plaintiff.

J. Andrew Nathan, Andrew J. Fisher, Nathan, Bremer, Dumm & Myers, P.C., Steven J. Dawes, Senter Goldfarb & Rice, L.L.C., Denver, CO, for Defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

Defendants move for summary judgment on Plaintiff's remaining claims for retaliation in violation of both 31 U.S.C. § 3730(h), and the First Amendment. Plaintiff moves for partial summary judgment on his First Amendment claim brought pursuant to 42 U.S.C. § 1983. The motions are adequately briefed and oral argument would not aid their resolution. For the reasons set forth below, I deny both motions. Jurisdiction exists under 28 U.S.C. § 1331.

## I.

The following facts are undisputed unless otherwise noted. Defendant City of Commerce City (City) employed Plaintiff as an engineering/rehabilitation specialist from 1981 to 1985, and as a Housing Rehabilitation Specialist from 1987 to September 1996. At all times relevant to this case, the City's Housing Division served the Housing Authority (HA) and Defendant Urban Renewal Authority (URA), which were separate entities governed by separate boards comprised of the same individuals. The HA and URA promoted grant funded programs that provided home ownership opportunities to low to moderate income families. In addition, a non-profit Housing Corporation (HC) existed with its own governing board. The HC was "distinct from the City and the HA and URA." *Defendants' Motion* at 2.

In September 1991, the URA sold a property for $22,000 to Margaret E. Bain. At that time, Ms. Bain was the live-in-girlfriend of HA/URA Board member J.C. Kopecky. Because Mr. Kopecky loaned the $22,000 used to purchase the property to Ms. Bain, the Board instructed Mr. Kopecky "to have no involvement with the property." *Id.* Defendants claim that Mr. Kopecky resigned from the HA/URA Boards in November 1993, purchased the property in May 1995, and then sold it for a profit. Plaintiff states that Mr. Kopecky bought the property from Ms. Bain, and was replaced on the HA/URA Boards in February 1994. Plaintiff also submits a report authored by Myra H. Barron stating that two warranty deeds indicate that the Kopecky–Bain transaction took place on December 31, 1994, the consideration paid in that transaction was $22,000, and Mr. Kopecky subsequently sold the property for $46,500 on May 18, 1995. *See Plaintiff's Response*, Ex. D. Plaintiff alleges that this series of transactions violated not only the URA's bylaws, but also federal conflict of interest regulations to which the URA is subject because it receives federal funds.

In 1994, the URA conveyed three properties to the children of HC Board member Gene Denman. Plaintiff alleges that because "[t]hese properties had been acquired, demolished, and/or rehabilitated by the [URA] with federal funds, the HC is a 'sub-recipient' of federal funds, and is thus subject to federal conflict of interest regulations." *Id.* at 4. Plaintiff also alleges that the URA awarded a bid to rehabilitate a property to a company in which Mr. Denman held an interest. These transactions, according to Plaintiff, violated federal conflict of interest regulations.

Plaintiff claims that in 1991 he complained to Steve House, the Director of Community Development, that the URA's sale to Ms. Bain violated the URA's by-laws and federal conflict of interest regulations. *See Plaintiff's Response* at 5; *see id.,* Ex. A, at 33. Plaintiff also contends that in 1994 and 1995, he spoke about his conflict of interest concerns regarding the transactions involving Mr. Denman with Mr. House, *see Defendants' Motion,* Ex. 1 (Holeman Dep.) at 34, his immediate supervisor, Ioanna Baker, *see id.* at 652, and City Manager Tim Gagen. *See id.* at 613. In response to Plaintiff's claims, Mr. Gagen allegedly responded that "paybacks are a bitch." *Plaintiff's Response,* Ex. 1 at 54, 64. After the summer of 1995, Plaintiff states that he addressed his conflict of interest concerns to Mr. House on "less than a dozen" occasions, *Defendants' Motion,* Ex. 1 (Holeman Dep.) at 275, as well as to Joyce James, his supervisor from April 6, 1996 until his resignation. *Plaintiff's Response,* Ex. A, at 297–98. Finally, Plaintiff alleges that he spoke about "conflict of interest" issues with mayor pro tem Sherry Szymanski in the summer of 1995, *Defendants' Motion,* Ex. 1 (Holeman Dep.), at 239–40, and with the president of the HA, Lynette Malloy, in late 1995 or early 1996. *See id.,* Ex. 1, at 281. Plaintiff states that Mr. House instructed Plaintiff not to go directly to Ms. Szymanski, but to use the chain of command. *Plaintiff's Response,* Ex. A, at 268. Defendants contend that "[p]rior to his resignation on September 4, 1996, no one in the Plaintiff's supervisory chain-including Ms. James, Mr. House and Mr. Gagen-had any information that Plaintiff intended to pursue conflict of interest allegations with the state or federal government." *Defendants' Motion* at 6.

Plaintiff also testified at a hearing held by Mr. Gagen on December 14, 1995 regarding a grievance filed by Ms. Baker against Mr. House. *See id.* at 10. Plaintiff's testimony supported Ms. Baker's charge. *See id.* Plaintiff alleges that two hours after the hearing Mr. House instructed Ms. Baker to investigate changing Plaintiff's position from full-time to contract. *See Plaintiff's Response,* Ex. H, at 182–183. According to Ms. Baker, this idea was first raised prior to December 14, 1995. *See id.* Ms. Baker believed the purpose of Mr. House's order/recommendation was "to get rid of" Plaintiff. *Id.* at 183. Ms. Baker was subsequently dismissed in December 1995. *See Defendants' Motion* at 10.

On March 9, 1996, Plaintiff filed a charge with the Equal Employment Opportunity Commission alleging that he had been discriminated against as a result of his testimony at Ms. Baker's grievance hearing. In June 1996, Plaintiff told City Administrator John Stressler that City Mayor John Busby had been renting out an apartment in his basement "in violation of zoning ordinances." *Plaintiff's Response* at 9. In his deposition, Mr. Stressler testified that when he brought Plaintiff's complaint to Mr. House's attention, Mr. House laughed and instructed him to "put it back in the file because Tommy Holeman is not going to be around here for that much longer." *Id.* Ex. O, at 15. Mr. House sent a memorandum to Plaintiff dated June 14, 1996 informing him that his "full-time status shall be reduced by one half, effective July 27, 1996, for an indefinite period of time." *Id.* Ex. P, at 1. The memorandum stated the decision resulted from a decrease in workload and funding,

and a need to cut administrative costs. The memorandum also contended that Plaintiff was selected for the reduction in hours over the other Housing Rehabilitation Specialist, Eloy Medina, because Mr. Medina was more senior. Mr. House contends that he had previously advised Plaintiff and Mr. Medina in the summer or fall of 1995 "that they might expect that one of their positions might be cut back or eliminated" "as a result of budgetary constraints." *Defendants' Reply*, Ex. 3 at para. 5.

On July 22, 1996, Plaintiff sent a "Tort Claim Notice" to the Mayor of, and attorney for, the City. In that notice, Plaintiff claimed that the actions of Messrs. House and Gagen, and Human Resources Director Monica Lopez "form the bases of the following state law tort claims: defamation, outrageous conduct and retaliation for whistleblowing." *Plaintiff's Response*, Ex. M at 2. Plaintiff claims that soon thereafter, he was "suspended without pay and severely reprimanded," *Plaintiff's Response* at 9, ostensibly for violating the City's leave policy. *See Defendants' Reply*, Ex. 2 (e-mail sent by Ms. Lopez identifying Plaintiff as only City employee with deficit in leave hours, and "recommending a suspension coupled with a severe written reprimand indicating that this is a 'pattern of behavior with him knowingly and wantonly violating City policies and procedures'"). Plaintiff also contends that after he was made a part-time employee, his superiors expected his work production to remain the same notwithstanding his reduction in hours, *Id.*, Ex. A, at 560–62, and Ms. James instructed him to "report daily on [his] activities." *Id.*, Ex. A, at 575–576. On September 4, 1996, Plaintiff resigned. Plaintiff claims this series of events indicates that Messrs. House and Gagen, and possibly others, conspired to constructively discharge him in retaliation for his complaints.

On October 9, 1996, Ms. Lopez sent an intra-office email indicating that if Plaintiff were seen "in City Hall or other business facility [sic], please call the police department immediately." *Plaintiff's Response*, Ex. S. Thomas Merrigan, the attorney for the City of Commerce City, sent a letter dated October 14, 1996 to Plaintiff informing him that he could only enter the City Hall with prior approval. *See Plaintiff's Response*, Ex. R. As justification, Mr. Merrigan wrote that "[b]ecause of the circumstances surrounding the cessation of your employment, and for other reasons, the City has determined that your presence at City Hall is unnecessarily disruptive." *Id.* Ms. Lopez testified that the City's decision resulted from encounters she had with Plaintiff in August and September 1995, and September 1996 in which she and her assistant, Sandra Garcia, felt threatened. *See Defendants' Response to Plaintiff's Motion for Determination of Entitlement to Attorney's Fees*, Ex. 1 (Lopez Dep.) at 139–42. Ms. James attempted to convince Ms. Lopez that Plaintiff's conditional ban was unnecessary because he was not violent. *See Plaintiff's Response*, Ex. K at 103–04. The city nevertheless maintained its conditional ban of plaintiff.

On April 3, 1998, Plaintiff filed his initial complaint in this case under seal because it contained a False Claims Act claim, otherwise known as a *qui tam* action. 31 U.S.C. § 3729(a). The original complaint also alleged claims for retaliation in violation of both 31 U.S.C. § 3730(h), and the First Amendment. Plaintiff brought the First Amendment claim pursuant to 42 U.S.C. § 1983. The United States declined to intervene on Plaintiff's behalf. Plaintiff moved for leave to file a Fourth Amended Complaint on September 21, 1999 to add an Equal Protection claim regarding his conditional ban from City Hall. In that motion, Plaintiff asserted in part that the City's conditional ban remained in effect notwithstanding that Ms. Lopez and Ms. Garcia left their employment with the City. On October 5, 1999, Mr. Merrigan notified Plaintiff that he no longer needed prior approval to enter City Hall. *See Defen-*

*dants' Response to Plaintiff's Motion for Determination of Entitlement to Attorney's Fees,* Ex. 6. I denied Plaintiff's motion to further amend his complaint on December 6, 1999. On December 15, 1999, I granted the parties' stipulation to dismiss without prejudice Plaintiff's *qui tam* claim.

## II.

### A.

Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The very purpose of a summary judgment motion is to assess whether a trial is necessary. *White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995). A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, that demonstrate the absence of genuine issues for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992). Once a properly supported summary judgment motion is made, the non-moving party has the burden of showing that issues of undetermined material fact exist. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. In so doing, the opposing party may not rest on the allegations contained in the complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States,* 622 F.2d 516, 519 (10th Cir.1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Unsupported allegations "without any significant probative evidence tending to support he complaint" are insufficient, *White,* 45 F.3d at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where, as here, the parties file cross motions for summary judgment, I assume that no evidence need be considered other than that filed by the parties. *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.,* 132 F.3d 1316, 1319 (10th Cir.1997). Nevertheless, summary judgment is inappropriate if genuine issues of material fact exist. *Id.*

In ruling on summary judgment, I must view the factual record and reasonable inferences therefrom in the light most favorable to the nonmoving party. *See id.* If no reasonable juror could find for the nonmoving party based on the evidence present in the motion and response, then summary judgment is proper and a trial is unnecessary. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment should not enter if a reasonable trier of fact could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505; *Mares,* 971 F.2d at 494.

### B.

#### 1.

The False Claims Act (FCA) imposes liability upon any "persons" who present false claims to the U.S. Government for "payment or approval." 31 U.S.C. § 3729. Under 31 U.S.C. 3730(b), a "private person" "may bring a civil [*qui tam* ] action for a violation of section 3729 for the person and for the United States Government." *Id.* at § 3730(b). Further, 31 U.S.C. § 3730(h) prohibits employer retaliation against "[a]ny employee ... because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of,

testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h). The retaliation can take the form of "discharge[ ], demot[ion], suspen[sion], threat[s], harass[ment], or [ ] any other [form of] discriminat[ion][ ] in the terms and conditions of employment by his or her employer." *Id.*

Under Section 3730(h), a plaintiff "need not actually file a *qui tam* action in order to maintain a claim." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir.1996). Instead, a plaintiff need only show that the activity prompting the employer's alleged retaliation was undertaken "in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government." *Id.* Accordingly, "the inquiry . . . is whether the actions described in the complaint could be reasonably . . . sufficient to put defendants on notice of a possible *qui tam* action." *Id.* Under this standard, "intracorporate complaints may fall within the protective scope of section 3730(h)," *id.; but see id.* (holding that the requisite notice did not exist because the employee's job required her to monitor and report to her superiors the compliance/noncompliance of day treatment programs with "required minimum program components," and her actions could be reasonably construed as merely consistent with her job responsibilities), "even if no FCA action is ultimately successful or even filed." *Id.*

2.

It is well-established that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Accordingly, I undertake a four-part inquiry in order to evaluate a public employee's claim that his employer has infringed this interest. *See Lytle v. City of Haysville*, 138 F.3d 857, 863 (10th Cir.1998). First, I consider whether the speech in question addresses a matter of public concern. *See id.* Mat-

ters of public concern are those of interest to the community, whether for social, political, or other reasons. *See Connick*, 461 U.S. at 145–149, 103 S.Ct. 1684. In contrast, matters of only personal interest to government employees are not protected by the First Amendment. *See id.* In determining whether a matter is one of public or private concern, I consider the "content, form, and context of [the] given statement[s], as revealed by the whole record." *Connick*, 461 U.S., at 147–48, 103 S.Ct. 1684.

■ Second, if the speech does address a matter of public concern, I must consider both the employee's interest in expression and the government employer's interest in regulating the speech of its employees in order to maintain an efficient and effective workplace. *See Lytle*, 138 F.3d at 863 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)); *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995). Speech is protected if the employee's interest outweighs the interest of the government employer. *See Moore*, 57 F.3d at 931. This process of weighing the respective interests is known as "the *Pickering* balancing test." *See Lytle*, 138 F.3d at 863. *See also Pickering*, 391 U.S. at 568, 88 S.Ct. 1731.

The Supreme Court has explained why a public employee's speech is not given unqualified protection, but rather is balanced against the employer's interest in efficient public service:

Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When [an employee] . . . begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain [him].

*Waters v. Churchill*, 511 U.S. 661, 674–75, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Thus, "the government as employer . . .

has far broader powers [over speech] than does the government as sovereign." *Id.* at 671, 114 S.Ct. 1878. Outside government workplaces, "[t]he First Amendment demands a tolerance of 'verbal tumult, discord, and even offensive utterance,' as 'necessary side effects of ... the process of open debate....' " *Id.* at 672, 114 S.Ct. 1878 (quoting *Cohen v. California,* 403 U.S. 15, 24–25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971)). Within government workplaces, however, the First Amendment demands considerably less: "The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate." *Id.* at 675, 114 S.Ct. 1878.

■ In balancing the employee's interest in expression against the government's interest in efficiency, a court must consider "the manner, time, and place of the employee's expression," as well as the events leading up to it. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). It is relevant "whether the statement impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id.* Additionally, an employee's responsibilities in the workplace are relevant to the *Pickering* balancing. *See id.; Koch v. City of Hutchinson,* 847 F.2d 1436, 1449–50 (10th Cir.1988) (en banc). "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin,* 483 U.S. at 390, 107 S.Ct. 2891.

■ If the speech survives the *Pickering* balancing test, the employee must next show that the speech was a substantial or motivating factor for the challenged governmental action. *See Lytle,* 138 F.3d at 863 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Finally, if the employee shows that the speech was a substantial or motivating factor, the employer must be given the opportunity to show that it would have taken the same action in the absence of the protected speech. *See id.* The first two *Lytle* steps are legal questions that I resolve to determine whether the speech is constitutionally protected. *Dill v. City of Edmond,* 155 F.3d 1193, 1201 (10th Cir.1998). Conversely, the latter two steps concern causation that are questions of fact appropriate for the jury in the event that summary judgment is not proper. *Id.*

### III.

### A.

### 1.

Defendants first argue that "it is undisputed that at no point while working for the City did Plaintiff advise, complain or threaten that he would pursue a *qui tam* claim or that he would take the issues to state or federal officials." *Defendants' Motion* at 16. Defendants also argue that, under the Tenth Circuit's decision in *Ramseyer,* Plaintiff's "complain[ts] to supervisors and peers [and] ... internal protests does not establish that [he] performed either an investigation for, or provided assistance in, a FCA action." *Id.* at 16–17. In their reply, Defendants note that the District of Columbia Circuit has cited *Ramseyer* for the proposition that "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is insufficient to support a Section 3730(h) claim. *U.S. ex rel. Yesudian v. Howard Univ.,* 153 F.3d 731, 740 (D.C.Cir.1998) (citing *Ramseyer* ). Defendants thus conclude they were "not 'on notice of' a potential FCA claim," *id.* at 17, and, consequently, that they are entitled to summary judgment on Plaintiff's section 3730(h) claim. I disagree.

Defendants characterization of Tenth Circuit law is inaccurate. As noted above, the Tenth Circuit specifically held in *Ramseyer* that "intracorporate complaints may fall within the protective scope of section 3730(h)." *Ramseyer,* 90 F.3d at 1522. In determining whether such complaints are sufficient to trigger a section 3730(h) claim, the Tenth Circuit held that the key inquiry is whether the Plaintiff's actions were "reasonably . . . sufficient to put defendants on notice of a *possible qui tam* action." *Id.* (emphasis added).

It is true, as Defendants point out, that the District of Columbia Circuit has cited *Ramseyer* for the proposition that "an employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is insufficient to support a Section 3730(h) claim. *Yesudian,* 153 F.3d at 740 (citing *Ramseyer*). However, I do not read *Ramseyer* as pronouncing a general rule that mere complaints regarding an employer's non-compliance with federal or state regulations can never support a Section 3730(h) claim. Instead, the Tenth Circuit indicated that the factual context matters. The dispositive fact in *Ramseyer,* therefore, was that "the monitoring and reporting activities described in plaintiff's complaint were exactly those activities [the *Ramseyer*] plaintiff was required to take in fulfillment of her job duties." *Ramseyer,* 90 F.3d at 1523. Under such circumstances, and absent any further action by the plaintiff, the employer in *Ramseyer* simply could not have known that the plaintiff was contemplating a *qui tam* action. *Yesudian* fails to account for the factual contingency of the *Ramseyer* decision.

Here, Defendants do not contend that Plaintiff's job required him to monitor the compliance of the URA, HA, and HC with federal conflict of interest regulations, or that his job responsibilities required him to otherwise communicate his concerns regarding such issues to Messrs. House and Gagen. Instead, Plaintiff's allegations indicate that his reports to his superiors were, if anything, outside the scope of his responsibilities. *Ramseyer* is thus distinguishable on its facts.

■ Viewing the factual record and reasonable inferences therefrom in the light most favorable to Plaintiff as I am required to do, Plaintiff repeatedly told Messrs. Gagen and House, Ms. Baker, Ms. James, and Ms. Malloy about his concerns regarding the transactions involving Ms. Bain/Mr. Kopecky and Mr. Denman's children. During those conversations, Plaintiff alleges he stated his belief that those transactions violated federal conflict of interest regulations. Although it does not appear Plaintiff believes Ms. Baker, Ms. James, or Ms. Malloy were part of the alleged conspiracy to constructively discharge him, it is reasonable to assume those individuals communicated Plaintiff's complaints, either directly or indirectly, to either Mr. House or Mr. Gagen. In addition, Plaintiff alleges that Mr. House became aware of his statements to Ms. Szymanski. Under these circumstances, reasonable jurors could conclude that Plaintiff's statements were "reasonably . . . sufficient to put defendants on notice of a possible *qui tam* action." *Ramseyer,* 90 F.3d at 1522. Genuine issues of material fact remain on that question. Summary judgment on Plaintiff's Section 3730(h) claim is inappropriate.

### 2.

Defendants next move for summary judgment on Plaintiff's First Amendment claim. Specifically, Defendants claim that there is no genuine issue of material fact with respect to each part of *Lytle*'s four-part test. *See Lytle,* 138 F.3d at 863. As noted above, while the first two *Lytle* factors—whether Plaintiff's alleged speech involved a matter of public concern, and the *Pickering* balancing test—are legal questions, the latter two—whether Plaintiff's alleged speech was a motivating factor in Defendants' employment decision, and whether Defendants would have undertaken the same actions in the absence of

Plaintiff's alleged speech—are questions of fact. *See Dill,* 155 F.3d at 1201. Accordingly, I will decide the first two factors, and then determine whether summary judgment is appropriate on the latter two.

a.

Defendants first argue that Plaintiff's speech was not a matter of public concern because Plaintiff did not "speak out with the *intent to inform the public on a matter of public concern.*" *Defendants' Reply* at 13 (emphasis in original). As support, Defendants cite *Cox v. Dardanelle,* 790 F.2d 668, 672 (8th Cir.1986). According to Defendants, because "Plaintiff did not initiate an independent investigation, make a public statement, notify the media, bring a legal claim, speak to the attorney general, or even put his complaints in writing," *Defendants' Reply* at 13, the subject-matter of Plaintiff's internal complaints—alleged conflict of interest violations committed by City officials—is not a matter of public concern. I disagree.

■ There is no question that a conflict of interest violation committed by a public official is a matter of public concern. Indeed, such conflicts are a serious breach of the public trust that government officials will not use their offices to reap personal financial benefits not available to others. *See Connick,* 461 U.S. at 148, 103 S.Ct. 1684 (noting that "breach of public trust" is a matter of public concern); *Gardetto v. Mason,* 100 F.3d 803 (10th Cir.1996) ("speech about the use of public funds touches upon a matter of public concern"); *Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir.1988) ("[s]peech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests;" and "[s]peech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import."). Notwithstanding that I am not bound by Eighth Circuit case law, under *Cox* the determination of whether a matter is of public concern does not turn on whether the plaintiff took some action to notify the public, as Defendants claim. *See Cox,* 790 F.2d at 672 n. 5 ("[i]t is clear that an employee's right to speak out on matters of public concern is not forfeited by the choice of a private forum.") (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)). Tenth Circuit authority also does not impose such a requirement. *See, e.g., Conaway,* 853 F.2d at 798 ("The fact that Conaway chose a private forum, rather than public, to express his concerns, does not remove it from First Amendment protection."). I conclude as a matter of law, therefore, that Plaintiff's speech addressed a matter of public concern.

b.

Defendants argue that the *Pickering* balancing test cannot be undertaken in this case because they "ha[ve] not restricted Plaintiff's speech." *Defendants' Reply* at 14. Specifically, Defendants state that Plaintiff cannot maintain his First Amendment claim unless he proves the City discharged him. *Defendants' Motion* at 25–28. Defendants also state that the *Pickering* balancing test is inapplicable because they "have not even claimed [Plaintiff's speech] was disruptive." *Id.* I disagree.

■ In the Tenth Circuit, adverse employment actions, such as changing an employee's status from full to part-time, or discharge, can constitute a restriction on speech, and serve as the basis for a First Amendment retaliation claim. *See, e.g., Gardetto,* 100 F.3d at 803 (Plaintiff who had been suspended and demoted had a viable First Amendment retaliation claim). Whether the *Pickering* balancing test applies cannot turn solely on the defendant employer's claimed justification for an adverse employment decision. After all, employers will only admit they undertook an adverse employment decision in order to restrict the affected employee's speech when they believe their action was justified

under *Pickering*. I will not hold, therefore, that Defendants did "not restrict[ ] Plaintiff's speech."

I conclude that Plaintiff was a whistleblower insofar as the subject matter of his complaints concerned alleged corruption, and Defendants have admitted that he pursued his complaints internally. *See Conaway*, 853 F.2d at 797 ("[w]hen balancing the rights of the employee against those of the employer, an employee's First Amendment interest is entitled to greater weight where he is acting as a whistle blower in exposing government corruption."); *Lytle*, 138 F.3d at 868 (noting that failure to pursue allegations internally can decrease the amount of weight accorded to whistleblower status in conducting *Pickering* balancing test). *See also Connick*, 461 U.S. at 145, 103 S.Ct. 1684.("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.") (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982)). Because Defendants maintain they did not reduce Plaintiff's hours as a result of his statements, they have not attempted to justify their decision in such terms. They have not alleged, therefore, that Plaintiff's statements had such an effect on City government that their only recourse was to decrease his hours. As the Tenth Circuit has held, "[t]o justify restricting employees' speech, defendants must show, inter alia, 'actual disruption of services which results from the employee[s'] speech.'" *Ramirez v. Oklahoma Dept. of Mental Health*, 41 F.3d 584, 594 (10th Cir.1994) (quoting *Schalk v. Gallemore*, 906 F.2d 491, 496 (10th Cir.1990) (other citations omitted)). Defendants have not met this burden. Under these circumstances, I conclude that as a matter of law Plaintiff has satisfied the *Pickering* balancing test by showing that his free speech right outweighs the interest of Defendants in an efficient and effective work environment. *See Moore*, 57 F.3d at 931.

### c.

■ Defendants argue that "Plaintiff was selected, rather than Mr. Medina, for a reduction in hours for various reasons, including seniority, financial necessity, job efficiency, and the decrease in CDBG rehabilitation projects." *Defendants' Motion* at 15. Plaintiff responds that a genuine issue of material fact remains regarding Defendants' motivation in reducing Plaintiff's hours. I agree.

Plaintiff has alleged that (1) Mr. Gagen commented that "paybacks are a bitch" in response to Plaintiff's claim that the transactions involving Messrs. Kopecky and Denman involved conflicts of interest; (2) Mr. House's instruction to Ms. Baker to investigate changing Plaintiff's position from full-time to contract occurred two hours after Plaintiff testified in favor of Ms. Baker in a grievance she filed against Mr. House; and (3) when Mr. Stressler brought one of Plaintiff's complaints to Mr. House's attention in June 1996, Mr. House instructed him to "put it back in the file because Tommy Holeman is not going to be around here for that much longer." *Id.* Ex. O, at 15. These allegations are sufficient to create a genuine issue of material fact regarding Defendants' motivation in reducing Plaintiff's hours. Summary judgment is inappropriate on this question.

### d.

Defendants finally argue that Plaintiff's hours would have been reduced irrespective of his complaints. Specifically, they claim that a decrease in financial resources led them to decrease the hours of one of the Housing Rehabilitation Specialist positions, and that they chose to reduce Plaintiff's hours because he had less seniority than Mr. Medina. In addition, Defendants state that Plaintiff's suspension was justified by his (1) refusal to sign the acknowledgment of receipt of the employee handbook; (2) delay in signing the acknowledgment with respect to the sexual harassment policies; (3) conflicts with management; (4) violation of the City's

leave policy; and (5) allegedly menacing behavior toward Ms. Lopez.

In response, Plaintiff cites deposition testimony by Ms. Baker and Ms. James to the effect that "the City had never used seniority as a basis for selection before or after [Plaintiff], and in fact, in another selection for termination had specifically not used seniority." *See Plaintiff's Response* at 33. Moreover, Plaintiff claims that in May 1996—two months prior to the reduction of his job to part-time—Defendant hired a contractor to do the same type of work as Plaintiff. *See id.* at 33 (citing deposition testimony by Ms. James). The hiring of the contractor, Plaintiff contends, casts doubt on Defendants' contention that the City cut Plaintiff's hours for financial reasons. Plaintiff also argues that because he conducted a wider range of work than Mr. Medina, there was a wider range of sources for funding his salary. Plaintiff concludes that if a funding shortfall existed requiring the reduction of one of the two full-time Housing Rehabilitation Specialists, he, and not Mr. Medina, should have been retained on a full-time basis. *See id.* at 34 (citing deposition testimony of Ms. Baker and M.J. Youngblood). Finally, Plaintiff cites deposition testimony by Ms. James indicating she thought Plaintiff's suspension, ostensibly for violating the City's leave policy, was "unusual," "harsh," and unwarranted, *see Plaintiff's Response,* Ex. K at 215, 219, 222, and that Defendant posed no threat to Ms. Lopez. *See id.* at 103–04.

Based on this record, genuine issues of material fact remain regarding whether Defendants would have suspended Plaintiff, and reduced his job to part-time, even if Plaintiff had not voiced his complaints. Summary judgment is inappropriate.

### B.

■ Plaintiff cross-moves for summary judgment on his First Amendment retaliation claim. Specifically, Plaintiff argues that in his deposition Mr. Merrigan admitted "that one of the reasons Defendants

extended its banishment of Mr. Holeman from all City property was because of his participation in this lawsuit." *Plaintiff's Response* at 39. Defendants respond that when read in context Mr. Merrigan's comment does not necessarily indicate retaliation. I agree.

Mr. Merrigan made the statement cited by Plaintiff in the context of a discussion regarding Defendant's contention that Plaintiff had been conditionally banned because Ms. Lopez and Ms. Garcia felt threatened by him. The relevant exchange is as follows:

Q: I understand that Sandra Garcia and Monica Lopez no longer work for the City; is that correct?

A. That's correct.

Q: A banishment of Mr. Holeman from City Hall had not been lifted, has it?

A: No, I don't suppose it's been lifted or not lifted.

Q: It's still in effect, right?

A: I suppose, yeah.

Q: How come?

A: Because he still has no reason to be there. And the last time he was there, his behavior was unnecessarily disruptive and he's still a disgruntled former employee. And he hasn't asked to have it lifted.

Q: Why is he still a disgruntled employee?

A: He's suing us. That's what disgruntled former employees do.

*Defendants' Reply,* Ex. 1, at 108–09. Contrary to Plaintiff's contention, Mr. Merrigan's statement does not necessarily indicate that Defendants maintained Plaintiff's conditional ban because he filed this lawsuit. Instead, one plausible interpretation of the exchange is that Defendants' viewed Plaintiff's filing of the instant lawsuit as an indication he continued to hold the alleged sentiments/emotions that allegedly led Ms. Garcia and Ms. Lopez to feel threatened by him. Filing the lawsuit, therefore, was not the reason for maintaining the condi-

tional ban, but suggested the original reason for the conditional ban remained relevant. Although Ms. Garcia and Ms. Lopez no longer worked for the City, it is also possible Defendants worried that Plaintiff would direct his alleged sentiments/emotions toward other City employees. Plaintiff's attorney failed to ask the follow-up questions necessary to fully elucidate Defendants' motivation in maintaining the conditional ban. Under these circumstances, genuine issues of material fact remain regarding why Defendants maintained Plaintiff's conditional ban after Ms. Garcia and Ms. Lopez terminated their employment with the City. Summary judgment is inappropriate.

Accordingly, IT IS ORDERED THAT:

(1) Defendants' motion for summary judgment is DENIED; and

(2) Plaintiff's cross-motion for summary judgment is DENIED.