**UNITED STATES of America ex rel. Ross WRIGHT, Plaintiff,**

v.

**CLEO WALLACE CENTERS, and Cleo Wallace Foundation, and James M. Cole, in his official capacity as Chief Executive Officer and President of Cleo Wallace Centers, Defendants.**

**No. CIV.A. 97–D–2517.**

United States District Court,
D. Colorado.

Dec. 21, 2000.

Michael C. Theis, Asst. U.S. Atty., U.S. Atty's Office, Denver, CO, for U.S.

Keith Cross, Joseph F. Bennett, Cross Bennett & Hessel, LLC, Colorado Springs, CO, for Ross Wright.

James E. Nesland, Cooley Godward, LLP, Denver, CO, for Cleo Wallace Centers.

## MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

THIS MATTER is before the Court on Defendants Motion for Dismissal, or in the Alternative, Summary Judgment, filed October 4, 1999; Plaintiffs Motion to Amend Complaint, filed November 1, 1999; Plaintiffs Motions to File Additional Authority, filed on December 6, 1999 and September 20, 2000; and Defendants Motion to Dismiss the Amended Complaint, or, in the Alternative, for Summary Judgment and Request for Certification of Interlocutory Appeal, filed October 10, 2000. A hearing on the motions was held on September 26, 2000.

## I. FACTUAL BACKGROUND

Plaintiff United States of America ex rel. Ross Wright ("Wright") brings this action in the name of the United States of America as a *qui tam* plaintiff pursuant to the False Claims Act (FCA), 31 U.S.C. § 3730(b) for alleged violations of the Act. Wrights Amended Complaint arises out of Defendants alleged unlawful conduct in knowingly and fraudulently securing Medicaid and Title IV–E funds and for terminating Wright. The Amended Complaint alleges, in pertinent part, that Wright was employed as the Administrator of the Colorado Springs campus of Defendant Cleo Wallace Centers (CWC) until his termination on September 25, 1997. CWC is a non-profit organization that provides psychiatric treatment and rehabilitation services for children and adolescents through psychiatric inpatient hospitals, residential treatment centers ("RTC") and day care centers. CWC has campuses in Colorado Springs, Westminster, and Denver. Facilities of this kind receive federal Medicaid and Title IV(e) funds via state agencies upon proper licensing pursuant to 42 U.S.C. § 1396. Defendant Cleo Wallace Foundation (Foundation) is a Colorado non-profit corporation allegedly organized solely to provide financial support to CWC and is otherwise indistinct from CWC.

Wright claims that during the period from October 1995 through July 1998, CWC was licensed by the state to operate 46–64 residential treatment beds at the Colorado Springs campus and 78 such beds at the Westminster campus. During this time CWC was also licensed to operate 29 inpatient psychiatric hospital beds at the Colorado Springs office and 32 such beds at the Westminster campus.

In August 1995, CWC expanded its inpatient psychiatric care facilities by building an additional inpatient facility at the Colorado Springs campus. Shortly thereafter, it became apparent that CWC would be unable to fill all of its inpatient psychiatric

beds. Thus, on October 5, 1990, Michael Montgomery, the Chief Operating Officer of CWC, issued a memorandum stated that RTC patients should be placed in inpatient psychiatric beds, i.e. the "swing-bed" plan. The "swing-bed" plan permitted Defendants to maintain higher census levels which generated substantially higher Medicaid reimbursements for RTC clients than would have otherwise been possible absent the plan.

In August 1997, Wright discovered a letter from Susan Rehak ("Rehak Letter"), a state regulatory official from the Colorado Department of Public Health and Environment (CDPHE), to attorneys for CWC, stating that the state regulatory officials were in no way granting CWC the right to make placements not otherwise authorized by their licenses, such as placing RTC clients in inpatient psychiatric beds. The letter indicated to Wright that, contrary to statements made by Cole and Montgomery, CWC was not, in fact, licensed to conduct the swing-bed plan. Wright further alleges that CWC never followed any state regulatory procedures which would have entitled it to operate its swing-bed plan. These discrepancies allegedly prompted Wright to investigate CWCs swing-bed practice. In the course of that investigation, Wright claims that he sought to discuss the Rehak Letter with Cole and Montgomery but was terminated shortly thereafter without explanation.

Wrights Amended Complaint asserts five causes of action. Wrights first and second causes of action seek to recover remedies available under 31 U.S.C. § 3730(b), for CWCs alleged submission of false claims for reimbursement of Medicaid funds for services to RTC clients unlawfully placed in inpatient psychiatric beds at both the Colorado Springs and Westminster campuses. Wrights third and fourth claims seek similar remedies under 3730(b) for reimbursement of Title IV–E funds for services to RTC clients unlawfully placed in inpatient psychiatric hospitals at both the Colorado Springs and Westminster campuses. Wrights fifth cause of action seeks reinstatement and damages arising out of his alleged retaliatory termination in violation of 31 U.S.C. § 3730(h).

## II. ANALYSIS

### A. Motion to Amend Complaint

As a threshold matter, I grant Wrights motion to amend his Complaint. Rule 15(a) provides that leave to amend shall be freely given when justice so requires. *Frank v. U.S. West,* 3 F.3d 1357, 1365 (10th Cir.1993). At the September 26, 2000 hearing, Defendants did not object to Wrights motion, but asserted that arguments in their motion to dismiss, or in the alternative, for summary judgment apply equally to the Amended Complaint. Accordingly, for the reasons stated on the record at the September 26, 2000 hearing, I conclude that Wrights motion to amend should be GRANTED. I therefore address only the arguments raised in the motions to dismiss that relate to the claims in the Amended Complaint.

### B. Defendants Motions to Dismiss, or in the Alternative, for Summary Judgment

Defendants move to dismiss the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) and for failure to state a claim under Fed.R.Civ.P. 12(b)(6), or, in the alternative, for summary judgment on all claims. I first address Defendants jurisdictional arguments.

#### 1. Lack of Jurisdiction

##### A. Constitutionality of the Qui Tam Provision of the Federal Claims Act, 31 U.S.C. § 3730

Defendants argue that the Court lacks jurisdiction over this case because the FCAs *qui tam* provision, 31 U.S.C. § 3730, is unconstitutional as applied to the facts before the Court. As courts of limited jurisdiction, federal courts may only adju-

dicate cases that the Constitution and Congress have granted them authority to hear. *Todd Holding Co., Inc. v. Super Valu Stores, Inc.*, 744 F.Supp. 1025, 1026 (D.Colo.1990). Where a party moves to dismiss for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the Court must look to the factual allegations of the Complaint. *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir.1971). "[T]he burden is on the party claiming jurisdiction to show it by a preponderance of the evidence." *Celli v. Shoell*, 40 F.3d 324, 327 (10th Cir.1994). "Mere conclusory allegations of jurisdiction are not enough." *United States, ex rel. Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir.1999).

Defendants contend that the FCAs *qui tam* provision violates the Take Care and Appointments Clauses of Article II of the U.S. Constitution under the separation of powers doctrine when the Attorney General refuses to intervene in the action. *See* U.S. Const. art. II, §§ 2, 3.

Before addressing the constitutionality of the *qui tam* provision, a brief summary of the disputed statute is warranted. The FCAs *qui tam* provision states, in pertinent part, that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government" to recover damages and penalties. *See* 31 U.S.C. § 3730(b). Such an action "shall be brought in the name of the government." *See id.* In bringing the action, the private party, or "relator," must serve a complaint and substantially all material evidence and information the relator possesses upon the government. *See id.* § 3730(b)(2). The U.S. Attorney then has sixty days within which it may elect to intervene. *Id.* If the Government chooses to intervene during the sixty-day period, it shall have the primary responsibility for prosecuting the action and shall not be bound by any act of the relator. *See id.* §§ 3730(b)(4)(A), 3730(c). If the government declines to intervene, then the relator may proceed with its case. *See id.*

§ 3730(b)(4)(B). However, even if the government has not intervened in the action, it is entitled to receipt of all pleadings and depositions filed in the case upon request. *See id.* § 3730(c)(3). Further, the government may still intervene after the sixty-day period upon a showing of good cause. *Id.*

Once the government has intervened in a *qui tam* action under the FCA, it may move to dismiss the action or settle the case after the relator has been provided an opportunity for a hearing on the motion. *See id.* § 3730(c)(2)(A)-(B). The government may also move to impose limitations upon the relators participation in the case, if it shows that the relators participation interferes with the governments prosecution of the action. *See id.* § 3730(c)(2)(c). I now turn to the alleged violation of the Take Care Clause.

### 1. Take Care Clause

▮▮▮▮ The Take Care Clause states that [the Executive] shall take Care that the Laws be faithfully executed. U.S. Const. Art. II, Sec. 3. This clause gives the Executive Branch the power to enforce the laws. *See Springer v. Government of Philippine Islands*, 277 U.S. 189, 202, 48 S.Ct. 480, 72 L.Ed. 845 (1928). The separation of powers doctrine prohibits one branch of government from intruding on the constitutional powers of another branch. *Humphrey's Executor v. United States*, 295 U.S. 602, 629–30, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). A violation of the doctrine may occur where an Act of Congress fails to give the Executive branch sufficient control over its enforcement powers "to ensure that the President is able to perform his constitutionally assigned duties." *Morrison v. Olson*, 487 U.S. 654, 696, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

▮▮▮ The Tenth Circuit has not addressed whether the restrictions on Executive authority in the FCAs *qui tam* provision violate the separation of powers doctrine and there is a conflict in the Cir-

cuits regarding the issue.[1] However, I am persuaded by the Ninth Circuits opinion in *United States, ex rel. Kelly v. Boeing Co.,* 9 F.3d 743 (9th Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433 (1994), which upheld the constitutionality of the FCAs *qui tam* provision in the face of a separation of powers challenge. In reaching its decision, the court looked to the Supreme Courts opinion in *Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), which upheld provisions of the Ethics in Government Act limiting the Executives authority over the activities of independent counsels.[2] The Ninth Circuit concluded that the Executives controls, such as the Attorney Generals qualified rights to intervene and dismiss, settle or limit the participation of relators in *qui tam* actions, were comparable to the limited controls on the Executives power upheld in *Morrison. See Kelly,* 9 F.3d at 751–55; *see also United States, ex rel. Taxpayers Against Fraud v. General Elec. Co.,* 41 F.3d 1032 (6th Cir.1994) (upholding the constitutionality of the FCAs qui tam provision for similar reasons). The court noted that the Executives only unqualified right regarding independent counsels, which is absent from the *qui tam* statute, was the ability to appoint the counsels and thereby initiate litigation. *See id.* at 754. The *Kelly* court nonetheless reasoned that because the executive retained more control over *qui tam* litigation than independent counsel proceedings once commenced, the inability to determine whether to initiate *qui tam* litigation was not significant. *See id.* I find *Kelly* s holding and rationale applicable here and conclude that under the

FCAs *qui tam* provision the Executive Branch retains sufficient control over relators to ensure that the Executive can perform his constitutionally assigned obligations.

This conclusion is further buttressed by the Supreme Courts reasoning in *Vermont Agency of Natural Resources v. United States, ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000). Defendants correctly argued at the September 26, 2000 hearing that *Stevens* expressly declined to address the present issues before the Court and determined only that a relator had standing under Article III to bring a *qui tam* action under the FCA when the Attorney General had declined to intervene. *See Stevens,* 120 S.Ct. at 1861, 1865 n. 8. However, I find that *Stevens* offers guidance here because the standing issue in *Stevens* is closely related to the issue before the Court.

In *Stevens,* the Supreme Court held that the relator had standing because FCAs *qui tam* provision effected a partial assignment of the governments damages claim for violation of the Act to the relator. *See id.* at 1863. The Court further determined that *qui tam* actions were "controversies of the sort traditionally amenable to, and resolved by, the judicial process," based on the long historical tradition favoring *qui tam* actions in England and the American colonies both before and after the Constitution was adopted. *See id.* at 1863–65. In light of the similarity between the issues in *Stevens* and this case, I conclude that the Court would likely uphold the constitutionality of the FCAs *qui tam* provision in the face of the Article II and

1. *Compare Riley v. St. Luke's Episcopal Hospital,* 196 F.3d 514 (5th Cir.1999), *rehg. en banc granted,* 196 F.3d 561 (5th Cir. Nov.15, 1999), *with United States, ex rel. Taxpayers Against Fraud v. General Elec. Co.,* 41 F.3d 1032 (6th Cir.1994), *and United States, ex rel. Kelly v. Boeing Co.,* 9 F.3d 743 (9th Cir.1993), *cert. denied,* 510 U.S. 1140, 114 S.Ct. 1125, 127 L.Ed.2d 433(1994).

2. The Court in *Morrison* held that the Executive Branch retained sufficient control over independent counsels to perform its constitu-

tionally assigned duties because: (1) the Attorney General had the power to appoint the independent counsel; (2) the Attorney General could remove the independent counsel, albeit upon a showing of "good cause;" (3) the jurisdiction of the independent counsel was defined with reference to the facts submitted by the Attorney General; and (4) a counsel, once appointed, had to follow Justice Department policies unless not otherwise possible to do so. *See Morrison v. Olson,* 487 U.S. 654, 696, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988).

separation of powers challenges raised here.

Defendant, however, urges the Court to follow the Fifth Circuits decision in *Riley v. St. Luke's Episcopal Hospital,* 196 F.3d 514 (5th Cir.1999), *rehg. en banc granted,* 196 F.3d 561 (5th Cir. Nov.15, 1999)[3], which reached a conclusion contrary to the Ninth Circuits holding in *Kelly.* The Fifth Circuit in *Riley* found the *qui tam* provision to be invalid because unlike the Ethics in Government Act, the *qui tam* provision lacked sufficient executive controls over the litigation, such as the discretion over whether to bring suit. *See Riley,* 196 F.3d at 529.

I reject *Riley's* conclusions as inconsistent with *Stevens* and based on an overly inflexible interpretation of *Morrison's* control test. In *Riley,* the Fifth Circuit found no merit to the relators reliance on the longstanding historical usage of *qui tam* statutes because such statutes had not been "extensively debated by the adopting Congress" and had not become "part of the fabric of our society." *See id.* at 519–20 (quoting *Marsh v. Chambers,* 463 U.S. 783, 792, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983)). However, the Court in *Stevens* gave substantial weight to the First Congress consideration and adoption of "informer" statutes which operated in a similar manner to the FCAs *qui tam* provision. *See Stevens,* 120 S.Ct. at 1863–65. *But see Riley,* 196 F.3d at 519–20.[4] After reviewing *Stevens* recitation of historical evidence in support of its conclusions as to Article III standing, I find that, unlike the Fifth Circuit, the Supreme Court would find support for the constitutionality of the FCAs *qui tam* statute from its historical tradition.

Further, *Riley's* construction of Morrisons "control" test is unpersuasive in light of *Stevens* holding that the FCAs *qui tam* provision effected a partial assignment of the governments rights to damages to the relator. Following *Stevens,* I conclude that if the Supreme Court were to address the Take Care Clause and separation of powers issues raised herein, it is likely that the Court would find that the governments partial assignment of rights for standing purposes invariably includes other rights of control over the litigation traditionally belonging to the Executive. Consequently, *Riley's* rigid application of *Morrison* to the FCAs *qui tam* provision is without merit in light of the *Stevens* decision.[5]

## 2. Appointments Clause

■ Next, I am unpersuaded by Defendants argument that the FCAs *qui tam*

---

3. The Court notes that *Riley* is vacated due to the fact that the request for rehearing *en banc* was granted on November 15, 1999. However, no *en banc* decision has issued as of the date of this opinion.

4. The Fifth Circuit in *Riley* gave little weight to the First Congress passage of informer statutes because it found such acts to be too sporadic to constitute an "unambiguous and unbroken history." *See Riley,* 196 F.3d at 519. The court further determined that the First Congress enactment of such laws alone did not support a finding of constitutionality because several acts passed by the First Congress were later determined to be unconstitutional. *See id.* at 520.

5. For example, *Riley* held that "when the sole injury—the only ticket into court—belongs to the government, the Executives prosecutorial discretion must include the power to decide

whether to bring suit." *Riley,* 196 F.3d at 526. The court further held that "the FCA provisions permitting *qui tam* actions to proceed when the government has decided not to intervene do encroach on the Executives authority to initiate litigation aimed solely at redressing the governments injuries." *Id.* Assuming, *arguendo,* that the Fifth Circuits holding was correct, such a conclusion is now doubtful following *Stevens* since there the Supreme Court held that the governments rights to sue for its own injury in fact were partially assigned to the relator under the FCA. *See Stevens,* 120 S.Ct. at 1863. Thus, the "ticket into court" or right to bring an action for damages based on the governments injury does not exclusively belong to the government under the *qui tam* provision. Consequently, under the FCA, the Executives prosecutorial discretion arguably no longer includes the exclusive right to determine whether and when to bring an action.

provision violates the Appointments Clause because the relator is an executive officer who has not been nominated and appointed in the manner set forth in that Clause. The Appointments Clause states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law." U.S. Const. Art. II, Sec. 2, d. 2. "Officers of the United States" as used in Article II, include persons who have primary responsibility and significant authority for enforcing the laws of the United States. *See Kelly*, 9 F.3d at 758 (citing *Buckley v. Valeo*, 424 U.S. 1, 126, 140, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)). The Ninth Circuit held that a single relator does not meet this definition because: (1) he must yield when the government elects to intervene; (2) his participation in the case may be further limited by the government after it intervenes; and (3) the relators limited authority extends only to one case. *See id.* at 758–59. Therefore, because the relator lacks primary responsibility over the litigation, he is not subject to the Appointments Clause. I find *Kelly* s reasoning persuasive and conclude that the FCAs *qui tam* provision does not violate the Appointments Clause.

Accordingly, for the reasons stated above, I conclude that the FCAs *qui tam* provision does not violate the Take Care and Appointments Clauses of Article II under the separation of powers doctrine.

### B. Public Disclosure Bar under 31 U.S.C. § 3730(e)(4)(A)

■ Defendants next move to dismiss for lack of subject matter jurisdiction under the public disclosure bar set forth in 31 U.S.C. § 3730(e)(4)(A) on the grounds that Wrights Amended Complaint is based on a public disclosure by CDPHE and for which Wright is not an original source. As a threshold matter, I convert this motion from a motion to dismiss to a motion for summary judgment since the jurisdictional question is intertwined with the substantive claims in the case and both parties are relying on matters outside of the pleadings in support of their respective positions. Fed.R.Civ.P. 12(b). "[A] court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case." *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir.1995); *see also Redmon v. United States*, 934 F.2d 1151, 1155 (10th Cir. 1991). The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statute which provides the substantive claim in the case. *See Wheeler v. Hurdman*, 825 F.2d 257, 259 n. 5 (10th Cir.), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987). "Jurisdictional challenges brought under [31 U.S.C. § 3730(e)(4) ] arise out of the same statute creating the cause of action (i.e., the False Claims Act) and are thus necessarily intertwined with the merits of the case." *United States, ex rel., Hafter v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1159 (10th Cir.1999); *United States, ex rel., Fine v. MK–Ferguson Co.*, 99 F.3d 1538, 1543 (10th Cir.1996) (citing *United States, ex rel., Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1517–18 (10th Cir. 1996)). Further, I find that consideration of the affidavits and other evidence submitted by the parties are useful to the Court and that the motion should thus be treated as one for summary judgment. *See Hafter*, 190 F.3d at 1159–60.

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to

judgment as a matter of law." Fed. R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. City and County of Denver,* 36 F.3d 1513, 1517 (10th Cir.1994), *cert. denied,* 514 U.S. 1004, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works,* 36 F.3d at 1518 (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. 2548). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *see* Fed.R.Civ.P. 56(e). Only admissible evidence may be considered when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.), *cert. denied,* 474 U.S. 823, 106 S.Ct. 77, 88 L.Ed.2d 63 (1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works,* 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990)).

■ Section 3730(e)(4)(A) of the FCA bars *qui tam* actions that are based on allegations of fraud already disclosed to the public, "in a criminal, civil, or administrative hearing, in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the suit qualifies as an original source of the information." 31 U.S.C. § 3730(e)(4)(A). Whether jurisdiction is proper under the public disclosure bar in section 3730(e)(4)(A) involves a four part test: (1) Does the alleged public disclosures contain allegations or transactions from one of the sources listed in the statute? (2) Has the alleged disclosure been made public within the meaning of the FCA? (3) Is the relators complaint based upon this public disclosure? (4) if so, whether the relator qualifies as an original source. *United States, ex rel., Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1161 (10th Cir. 1999); *MK-Ferguson,* 99 F.3d at 1544.

■ The Courts fundamental task in interpreting the FCA is "to give effect to the intent of Congress." *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). The purpose behind the jurisdictional bar is to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States, ex rel., Fine v. Sandia Corporation,* 70 F.3d 568, 571 (10th Cir.1995) (quotation omitted). This purpose is not served by allowing *qui tam* relators to recover where the government has already identified the problem and has an easily identifiable group of probable offenders. *See id.* at 572-73. As a result, a relator's claim should be analyzed "in the context of Congress' twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *See United States, ex rel., Fine v. Advanced Sciences,* 99 F.3d 1000, 1004 (10th Cir.1996) (quotation omitted).

Defendants argue that the first and second claims in the Amended Complaint are barred under 31 U.S.C. § 3730(e)(4)(A) in light of the July 22, 1997 letter from Susan E. Rehak, Deputy Director of the Health Facilities Division of the Colorado Department of Public Health and Environment, to Frederick Y. Yu, counsel for Defendants (the "Rehak Letter"). *See* Defendants Brief in Support of Defendants Motion to Dismiss or, in the Alternative, for Summary Judgment ("Defendants Brief"), Ex.

A. Defendants claim that the Rehak Letter constitutes a public disclosure and that Wright is not the original source of the information. I disagree.

■ Section 3730(e)(4)(A) does not require that the public disclosure identify the statutory basis for the allegations or transactions, but only requires public disclosure of the material elements of the fraudulent transaction, even if the disclosure contains no allegation of wrongdoing. *See Fine,* 70 F.3d at 572. "Fraud requires recognition of two elements: a misrepresented state of facts and a true state of facts." *United States, ex rel. Springfield Terminal Railway Co. v. Quinn,* 14 F.3d 645, 655 (D.C.Cir.1994). "The presence of one or the other in the public domain, but not both, cannot be expected to set the government investigators on the trail of fraud." *Id.*

■ Viewing the evidence in the light most favorable to Wright, I find that the Rehak Letter does not set forth allegations or transactions that fraudulent Medicaid claims were knowingly presented to the United States government. *See* 31 U.S.C. § 3729(a)(1). The Rehak Letter advises Defendants against pursuing its concept of using psychiatric beds on a temporary basis for residential patients. *See id.*[6] The letter further clarifies the parameters of permissible activities under Defendants license, but does not make any reference to a misrepresented state of facts, much less indicate that anyone is knowingly misrepresenting facts. *See* Defendants Brief, Ex.

A. Consequently, genuine issues of material fact exist as to whether the Rehak Letter fails to include "allegations or transactions" as contemplated under 31 U.S.C. § 3730(e)(4)(A).

■ I also find that genuine issues of material fact remain as to whether Wright was the original source of the information. To qualify as an original source, Wright must demonstrate that: (1) he has "direct and independent knowledge of the information on which the allegations are based," and (2) he "voluntarily provided such information to the government prior to filing." *See United States, ex rel. Hafter v. Spectrum Emergency Care, Inc.,* 190 F.3d 1156, 1161 (10th Cir.1999) (quoting 31 U.S.C. § 3730(e)(4)(B)). To demonstrate that he has "direct and independent knowledge of the information," Wright must show that the information underlying the Amended Complaint is based on his own efforts "and not by the labors of others, and that [his] information was not derivative of the information of others". *See id.* at 1162.

In his affidavit, Wright avers that Defendant Cole informed him and the rest of the management team that Defendant CWC had obtained "dual licensure" which permitted the swing-bed practice of using psychiatric inpatient beds for Residential Treatment Center children. *See* Plaintiff s Brief in Opposition, Ex. 24, Wright Aff., at 1–2. Wright further states that he became aware of potentially fraudulent activities upon reviewing the Rehak Letter because

6. The Rehak Letter states, in pertinent part, that:

> You [Defendants counsel] also note ... that you are interested in exploring the concept of a psychiatric bed being used on a temporary basis for a residential patient. Preliminary discussions with representatives of the Department of Human Services indicated reservations with this concept. "Please note that although you state in your letter that the general rules for Child Care Facilities issued by the Colorado Department of Human Services provide an RCCF licensing exemption for a child care facility that is approved, certified or licensed by any

> other state department or agency...," we are *not* issuing Cleo Wallace a license to operate a child care facility; we are issuing Cleo Wallace a license to operate a psychiatric hospital. While we respect your goal of offering integrated care as seamlessly as possible across different licensed entities, we do not believe your request to combine locations on a single license addresses this issue, and we are not agreeing to allow the psychiatric hospital to provide services beyond or outside its license in this letter. Defendants Brief, Ex. A (emphasis in original).

the letter indicated that CWC was not, in fact, licensed for the swing-bed practice. *See id.* at 2. Wright later voluntarily contacted the Colorado Medicaid fraud unit in October 1997 and provided the state investigator with information related to Defendants alleged Medicaid fraud. *Id.* at 3–4. Further, David Dechant, the state Medicaid fraud investigator who investigated the alleged fraudulent transactions at issue in this case, averred that but for Wright s voluntarily provided information, state regulatory officials would never have discovered CWC s allegedly fraudulent swing-bed scheme. *See id.,* Ex. 1, Dechant Aff., at 8. I therefore conclude Wright has raised genuine issues of material fact as to whether he was an original source of the information on which the first two claims of his Amended Complaint are based.

Defendants also move to dismiss the third and fourth claims in the Amended Complaint under 31 U.S.C. § 3730(e)(4)(A) on the ground that Wright is not the "original source" of information contained in the Colorado Attorney Generals Progress Report ("Progress Report"), dated February 26, 1999. Wright does not dispute that the Progress Report is a public disclosure of allegations under 31 U.S.C. § 3730(e)(4)(A). Instead, he argues that he is an original source of the information in his Title IV–E claims, notwithstanding the Progress Report.

The third and fourth claims in the Amended Complaint allege that Defendants submitted invoices for payment of "maintenance," under Title IV–E, 42 U.S.C. § 675(4)(A), which includes room and board for RTC children unlawfully placed in uncertified facilities. *See* Amended Complaint, at ¶¶ 54–56. According to Wright, the Title IV–E maintenance payments that Defendants received from local and state departments of human services constituted payments from the United States for false claims. *See id.* ¶ 55. The February 26, 1999 Progress Report charges that "CWC has billed and received payment from county departments of hu-

man services for room and board (partially funded by Section 470, Title IV–E of the Social Security Act ...) when certified recipients (Colorado RTC clients) were housed in a non-certified facility (CWC inpatient psychiatric hospitals)." Defendants Reply Brief, Ex. A, at 2. The report further indicates that current investigation has shown that CWC s inpatient psychiatric hospitals are ineligible to receive Title IV–E payments because they not IV–E certified. *See id.* at 47.

However, Wright originally contacted the Medicaid fraud unit in October of 1997. *See* Plaintiff s Brief in Opposition, Ex. 24, Wright Aff., at 3. Wright avers that at the time he was aware of billing records and databases that demonstrate that CWC received federal IV–E funds for RTC children unlawfully housed in inpatient facilities. *See id.* at 6. Wright further states that "[he] supplied written documentation concerning the fraudulent swing bed scheme to the United States attorney and the state of Colorado s Medicaid Fraud Control Unit." *See* Plaintiff s Brief in Opposition, Ex. 24, Wright Aff., at 5. Dechant confirms that he interviewed Wright on February 19, 1998. *See id.,* Ex. 1, at 2. Dechant also avers that

> Without the information voluntarily provided to my office by Ross Wright, state regulatory officials that I interviewed would never have learned of the fact that the Cleo Wallace Centers were collecting Medicaid and Title IVe funds for the unauthorized placement of Residential Treatment Center children in inpatient facilities. It was through the interviews that my agency conducted along with the Federal Bureau of Investigation that confirmed the unauthorized placements as first reported by Ross Wright....

*Id.* at 8. Dechant then submitted the Progress Report containing the allegations of fraudulent receipt of Title IV–E payments on July 26, 1999.

These facts, when viewed in the light most favorable to Wright, demonstrate

that Wright had direct and independent knowledge of the facts forming the basis for the third and fourth claims in his Amended Complaint. The fact that Wright s amendment followed the July 26, 1999 Progress Report does not negate the possibility that Wright was the original source of the information found in the report. I therefore conclude that genuine issues of material fact remain as to whether Wright was the original source for his FCA claims relating to Title IV–E.

## 2. Failure to State a Claim

Defendants next move to dismiss the claims in Wright s Amended Complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6). In reviewing a motion to dismiss under Rule 12(b)(6), the court must accept all the well-pleaded allegations as true and must construe them in the light most favorable to the plaintiff. *David v. City and County of Denver*, 101 F.3d 1344, 1352 (10th Cir.1996), *cert. denied*, 522 U.S. 858, 118 S.Ct. 157, 139 L.Ed.2d 102 (1997) (quoting *Gagan v. Norton*, 35 F.3d 1473, 1474 n. 1 (10th Cir.1994)). A complaint may be dismissed pursuant to Fed. R.Civ.P. 12(b)(6) only if the plaintiff can prove no set of facts to support a claim for relief. *Id.* (quoting *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir.1995)).

### A. Fraud Claims [7]

Defendants contend that Wright s first and second claims for relief should be dismissed because the swing-bed practice constitutes, at most, a state licensing violation and not a separate claim under the FCA. Specifically, Defendants argue under *United States, ex rel., Hopper v. Anton*, 91 F.3d 1261 (9th Cir.1996), that it is the false certification of compliance with state rules and regulations which triggers liability un-

der the FCA and not the violation of those rules alone. Defendants contend that because none of CWC s claims for Medicaid payments contains such certifications, there is no violation of the FCA. In contrast, Wright relies on the Tenth Circuit s recent opinion in *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir.2000), to argue that CWC impliedly certified that it was in compliance with state rules and regulations when it submitted Medicaid payment requests arising out of its swing-bed practice.

Under section 3729(a)(1) of the FCA, liability attaches to any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval. In interpreting this section, the Ninth Circuit has held that,

> Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit.

*United States, ex rel., Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996); *see also United States, ex rel., Siewick v. Jamieson Science and Engineering, Inc.*, 214 F.3d 1372, 1376 (D.C.Cir.2000) (quoting same).

However, the Tenth Circuit in *Shaw* held that under some circumstances, a party may impliedly certify that it has complied with all relevant rules, subject the party to liability under section 3729(a)(1). In *Shaw*, the court held that invoices submitted to the government by a government contractor impliedly certified that the contractor had complied with the terms of the contract. *See Shaw*, 213 F.3d at 533. While *Shaw* dealt with implied certification

---

7. In their first motion to dismiss, Defendants argued that plaintiffs complaint should be dismissed pursuant to Fed.R.Civ.P. 9(b) because Plaintiffs fraud claims fail to plead with particularity. Generally, claims brought under the FCA must be pled with particularity. *United States ex rel. Thompson v. Columbia*

*HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997). However, for the reasons stated herein, I conclude that Plaintiff s Amended Complaint meets the requisite degree of particularity under Fed.R.Civ.P. 9(b) and *Thompson*.

in the context of a government contract rather than Medicaid reimbursement claims, the rationale behind the Tenth Circuit s holding is instructive. The court in *Shaw* relied on both the FCA s legislative history and statutory language to conclude that "FCA liability under § 3729(a)(1) may arise even absent an affirmative or express false statement by the government contractor." *See id.* at 531–32. The court found support from a 1986 report from the Senate Committee on the Judiciary, which stated that a false claim under the FCA "may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute or regulation." *See id.* at 531 (quoting S.Rep. No. 99–345 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5274). Further, the court determined that such claims may occur "without the additional element of a false record or statement," as required by 31 U.S.C. § 3729(a)(2). *See id.*

Moreover, the Tenth Circuit in *Shaw* distinguished *Hopper* by determining that the allegedly fraudulent forms in *Hopper* "did not request payment for statutory or contractual compliance and thus did not impliedly certify such compliance." *See Shaw*, 213 F.3d at 533; *Hopper*, 91 F.3d at 1266 (discussing the fact that California apportions federal funds to its school districts based on a variety of factors in addition to the per student basis listed in the forms submitted to the state by school districts). *Hopper* also upheld summary judgment for the defendant because the relator had not produced evidence that the defendant knowingly maintained a fraudulent policy that was not in compliance with federal laws. *See Hopper*, 91 F.3d at 1267–68; *Shaw*, 213 F.3d at 533.

After fully reviewing the Tenth Circuits opinion in *Shaw*, I conclude that a person who knowingly submits claims to the government for the purpose of acquiring federal Medicaid funds while not in compliance with all relevant laws, rules and regulations may constitute a false

claim under the FCA, even without an affirmative or express false statement of such compliance. *See United States, ex rel., Pogue v. American Healthcorp, Inc.*, 914 F.Supp. 1507, 1509–10, 1513 (M.D.Tenn.1996) (vacating prior dismissal and adopting relator s implied certification argument that a violation of the False Claims Act occurs where claims are submitted for the purpose of inducing payment from the government while knowingly failing to comply with the laws governing the Medicare Act).

Applying the above principles to the Amended Complaint, I conclude that Wright has stated a claim under section 3729(a)(1). The Amended Complaint specifically alleges that Defendants submitted claims to be paid from Medicaid funds based on services rendered to RTC children in facilities that were not licensed for those services. *See*, Amended Complaint, at ¶¶ 35–38. Further, the Amended Complaint alleges facts indicating that Defendants knew that they were submitting claims for services they were not licensed to provide. *See id.* at ¶¶ 24–29. Wright therefore has alleged that Defendants requested payment in exchange for statutory compliance and therefore impliedly certified that such requests were properly made in accordance with state and federal laws, rules and regulations. Defendants motion to dismiss Wright s first claim in his Amended Complaint is therefore denied.

**B. Retaliation Claim**

Defendants also seek dismissal of Wright s claim of retaliatory discharge under section 3730(h) of the FCA. Defendants specifically contend that Wright's allegations do not establish that he was engaged in a protected investigation of CWC or that Defendants knew that Wright was engaging in a protected investigation. Section 3730(h) states, in pertinent part:

Any employee who is discharged ... because of lawful acts done ... in fur-

therance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole....

31 U.S.C. § 3730(h).

■ "When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendants had been put on notice that plaintiff was either taking action in furtherance of a private qui tam action or assisting in an FCA action brought by the government." *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1521 (10th Cir.1996). Therefore, the Court's inquiry in a case such as this is "whether the actions alleged in the complaint could be reasonably described as an investigation sufficient to put defendants on notice of a possible qui tam action." *Id.*

■ Wright's Amended Complaint alleges that after discovering the Rehak letter, indicating that CWC was not licensed for its swing bed practice, Wright left a voice message for James Cole on September 9, 1997 stating that he wanted to speak with Cole about the letter. Amended Complaint, ¶ 72. On September 11, 1997, rather than meeting with Wright, Cole ordered that Wright be placed on an immediate leave of absence. *Id.* ¶ 74. Wright subsequently showed the Rehak letter to the Chief Operating Officer, Montgomery who was visibly upset that Wright was in possession of the letter and asked Wright whether he had shown the letter to anyone else. *Id.* ¶ 75. CWC then terminated Plaintiff on September 25, 1997 with no explanation. *Id.*

Defendants contend that under the Tenth Circuit's opinion in *Ramseyer*, Wright fails to state a claim under 31 U.S.C. § 3730(h) because Wright's allegations do not advise Defendants that he was involved in an investigation in furtherance of pursuing a *qui tam* claim. I disagree.

*Ramseyer* is distinguishable from the facts in this case. In *Ramseyer*, it was part of the plaintiff's job to investigate and report fraud. *Ramseyer*, 90 F.3d at 1522–23. The court therefore held that persons such as the plaintiff "must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Ramseyer*, 90 F.3d at 1523 n. 7. Here, the Amended Complaint does not reflect that Wright's daily job responsibilities included the investigation and reporting of fraud.

Further, the Tenth Circuit in *Ramseyer* acknowledged that "intracorporate complaints may fall within the protective scope of section 3730(h)." *Id.* at 1523. At least one opinion from this Court has relied this statement, in part, to decline to interpret *Ramseyer* "as pronouncing a general rule that mere complaints regarding an employer's non-compliance with federal or state regulations can never support a Section 3730(b) claim." *United States, ex rel. Holeman v. City of Commerce City*, 112 F.Supp.2d 1079, 1086 (D.Colo.2000). In *Holeman*, the plaintiff had made several complaints to employees about perceived violations of federal conflict of interest regulations. *See id.* The court rejected defense arguments similar to those raised in this case and held that genuine issues of fact existed as to whether Plaintiff's statements reasonably placed the employer on notice that the plaintiff might possibly have been pursuing an FCA action. *See id.*

Viewing the allegations in the Amended Complaint as true, Cole and Montgomery knew that CWC was not licensed for the swing-bed practice which they had authorized. The swing bed system also resulted in CWC receiving substantially more reimbursement from federal programs, such as Medicaid. Further, the Rehak Letter placed Defendants on notice that its swing bed practice was unlawful, even though the letter by itself did not indicate that CWC

was engaged in fraudulent activity. In short, the Letter could likely have indicated to Cole and Montgomery that the profits CWC was deriving through its swing-bed practice were based on unlawful conduct that could form the basis of an FCA qui tam action. Consequently, the fact that Wright was expressing concerns about the letter could have placed Cole and Montgomery on notice that Wright was pursuing an investigation in pursuit of a qui tam action. This is supported by the allegations surrounding Wright s termination which demonstrate that rather than discuss Wright s concerns over the Rehak Letter, Cole placed Wright on an involuntarily leave of absence and then CWC terminated him shortly thereafter. Thus, I find that Plaintiff s alleged actions were "reasonably ... sufficient to put defendants on notice of a possible qui tam action." See Holeman, 112 F.Supp.2d at 1086 (quoting Ramseyer, 90 F.3d at 1522). I therefore conclude that with respect to the retaliation claim, Defendants motion to dismiss Wright s allegations of Defendants conduct prior to and including his discharge is denied.

■ Plaintiff also seeks to recover damages for alleged acts of retaliation that occurred after his termination. The relief requested is not proper. Section 3730(h) specifically provides remedies for retaliatory discharge but not for acts of retaliation subsequent to termination. Wright provides no authority for such a broad reading of the provision or for his efforts to graft the law of Title VII retaliation onto the FCA. I therefore conclude that with respect to the retaliation claim, Defendants motion to dismiss Wright s allegations of Defendants conduct prior to his discharge is denied. The motion is granted, however, as to Wright s allegations of Defendants retaliatory conduct following his discharge.

## C. Alter Ego Allegations

■ Defendants next seek to dismiss the claims against Defendant Cleo Wallace Foundation because Wright has not sufficiently alleged that the foundation is the alter ego of CWC. As a general rule, "the corporate veil should be pierced only reluctantly and cautiously." See National Labor Relations Board v. Greater Kansas City Roofing, 2 F.3d 1047, 1051 (10th Cir. 1993). In determining whether to pierce the corporate veil and hold another entity liable for a corporation s conduct on an alter ego theory, the Court must determine: (1) whether there was such a unity of interest and lack of respect given to the separate entity of the corporation by its shareholders that the personalities and assets of the corporation and the individual are indistinct, and (2) whether adherence to the corporate fiction would sanction a fraud, promote injustice, or lead to an evasion of legal obligations. See National Labor Relations Board v. Greater Kansas City Roofing, 2 F.3d 1047, 1052 (10th Cir. 1993). Under the first prong, the court should consider: "(1) the degree to which corporate legal formalities have been maintained; and (2) the degree to which individual and corporate assets and affairs have been commingled." Id. As to the second prong, there must be "an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil." Id. at 1053. Further, "the showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form." Id. "In most cases, the mere fact that a corporation is incapable of paying all its debts is insufficient for a finding of injustice." Id.

■ The Amended Complaint alleges: Cleo Wallace Centers and Cleo Wallace Foundation are jointly managed by identical officers and directors. Cleo Wallace Centers and Cleo Wallace Foundation employ the same personnel. Cleo Wallace has no separate physical location. Cleo Wallace Foundation exists solely for the purpose of providing financial support for Cleo Wallace Centers. The Bylaws of the Foundation provide

Cleo Wallace Centers with the sole authority to direct the Foundation s activities, management and policies. The board of directors for the Foundation and the board of directors for Cleo Wallace Centers meet jointly and are made up of individuals who alternate from one Board to the other. Cleo Wallace Centers and Cleo Wallace Foundation are required by law to file consolidated financial statements.

Amended Complaint, ¶ 3.

While Plaintiff s alter ego allegations are somewhat vague, I find that they are sufficient to withstand a motion to dismiss under 12(b)(6). Under the facts as alleged, the foundation has no separate existence but for providing financial support to CWC. Further, CWC actually directs the activities of the Foundation, making the conduct of CWC and the Foundation one and the same. Finally, both corporations are managed by roughly the same personnel. Thus, I find that the Amended Complaint satisfies the first prong under *Greater Kansas City Roofing.*

Next, I conclude that upholding the corporate form would lead to injustice. The facts demonstrate that CWC s ability to pay its obligations is dependent upon the Foundation. Thus, given that the corporations activities are in fact governed only by CWC and that the Foundation exists only to provide financial support for CWC, it would be inequitable to permit CWC and the Foundation to escape liability for CWC s actions simply by virtue of the corporate shield. I therefore deny Defendants motion with respect to these allegations.

### C. Interlocutory Appeal

Finally, Defendants seek certification of an interlocutory appeal should the Court deny its motion. Defendants request is denied. The relevant statute, 28 U.S.C. § 1292(b), provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order.

While I agree that there are novel issues of addressed in this Order, for the reasons stated above, I do not conclude that there is substantial ground for difference of opinion. Moreover, this case is over three years old and permitting appeal of the Order at this time will not materially advance the ultimate termination of this litigation. Defendants request for an interlocutory appeal is therefore denied.

### III. Conclusion

Accordingly, it is

ORDERED that Plaintiff s Motion to Amend Complaint, filed November 1, 1999, is GRANTED. Plaintiff s Amended Complaint is filed as of the date of this Order. It is

FURTHER ORDERED that Defendants Motion for Dismissal, or in the Alternative, Summary Judgment, filed October 4, 1999, and Defendants Motion to Dismiss the Amended Complaint, or, in the Alternative, for Summary Judgment and Request for Certification of Interlocutory Appeal, filed October 10, 2000 are GRANTED IN PART AND DENIED IN PART as stated in this Order. It is

FURTHER ORDERED that Plaintiff s Motions to File Additional Authority filed on December 6, 1999 and September 20, 2000, are GRANTED.